[Crim. No. 6493. In Bank. Dec. 23, 1959.]

## THE PEOPLE, Respondent, v. LAWRENCE WADE, Appellant.

[Crim. No. 6494. In Bank. Dec. 23, 1959.]

## THE PEOPLE, Respondent, v. ELLA MAE MILLER, Appellant.

Wilmont Sweeney and Ruth Jacobs, under appointment by the Supreme Court, for Appellants.

Stanley Mosk, Attorney General, John S. McInerny and Miriam E. Wolff, Deputy Attorneys General, for Respondent.

WHITE, J.—This is an appeal pursuant to section 1239, subdivision (b), of the Penal Code from a judgment imposing the death penalty on Lawrence Wade following his conviction of murder in the first degree. He also appeals from a judgment of conviction of attempted robbery in the first degree. His codefendant, Ella Mae Miller, appeals from judgments of conviction of murder in the first degree and attempted robbery in the first degree following her pleas of guilty, and attempts to appeal from an order denying probation.

The material facts are in dispute. It appears, however, that the defendants were living together in defendant Ella Mae Miller's apartment in Oakland at the time of the incidents mentioned herein. They went for a ride in Ella Mae's Chrysler automobile on the evening of August 12, 1958, stopping near the intersection of Aileen and Shattuck Avenues in Oakland. Wade testified that after getting out of the automobile he crossed the intersection and entered the Idora Liquor Store in order to purchase some chewing gum; that the proprietor, the decedent, Sorenson, said "What do you want, boy?" and, on Wade's hesitation, drew a gun and started

shooting. Wade further testified that he drew his own pistol only after he was wounded, that he shot several times then turned and ran out of the store. He testified that he then entered the Chrysler which Ella Mae had moved nearer to the store and that he told her to drive him to a hospital as he was badly wounded.

When the automobile was halted several blocks from the scene of the shooting, Wade was found to be wounded in several places and was taken to a hospital.

Ella Mae testified that before stopping at the Idora Liquor Store on the night of the 12th of August they stopped at a grocery store somewhere in Oakland; that Wade went inside but returned shortly, saying ". . . the cash register was stuck and he couldn't get it open." She could not remember the name or location of this grocery store, except that it was in Oakland. She further testified that when they halted near the Idora Liquor Store, Wade told her that he was watching the store, and he sat in the car for a while merely looking in the direction of the store. She said that after so sitting for a while, Wade left the automobile, walked over to the front of the store and then beckoned to her to bring the car across the intersection and double park near the store; that he then came over to the car and took two guns out of a canvas bag in the rear of the vehicle; that he put one, an air pistol, on the front seat, and that he took the other, the fatal weapon, a .22 caliber pistol, into the store with him. He was in the store only a short time, she averred, when she heard a commotion, and in a short time Wade reappeared, got in the car, and told her to "move fast."

Mrs. Helen Chen, also known as Helen Chen Yow, owner of a grocery store on Adeline Street in Oakland, testified that on the night of the shooting, and preceding it, she was alone in her store when a man entered and, by asking questions as to whether Mrs. Chen was alone in the store and motioning as if he had a gun in his pocket, so frightened her that she locked herself in a back room. She testified that she then heard the sounds of the cash register being manipulated, but later found nothing missing therefrom. She could not identify the man who entered her store, but testified that, like the defendant, he was a male Negro wearing brown clothes. This testimony was admitted for the stated purposes of showing the intent of defendant Wade on the night of the shooting and to corroborate the testimony of codefendant Ella Mae.

Policeman Robert Sexauer testified that while guarding

Wade at the hospital on the day after the shooting they had a conversation during which Wade said that on entering the Idora Liquor Store he had told Sorenson "This is it," and, from inside his pocket, pointed his gun at Sorenson. In rebuttal, testimony was elicited on behalf of Wade that he was in poor physical condition and was under the influence of narcotics prescribed by the hospital staff on the day of the alleged admissions. Wade testified that he did not remember ever seeing Officer Sexauer before the trial.

Other evidence placed Wade in the store with his gun in hand, but a conflict developed as to which man, Wade or the deceased, had drawn a gun and shot first.

Wade testified that he was in possession of the guns because of fear for his safety due to threats allegedly made against his person by the man with whom Wade's wife was living.

The jury convicted Wade on both counts of the information, and following the hearing to determine a penalty for the murder conviction, recommended execution. A motion for a new trial was denied.

Ella Mae Miller had been arrested with Wade as she was driving them away from the scene of the shooting. Because. of her admitted knowledge of Wade's criminal intent when he entered the Idora Liquor Store, and her cooperation thereafter until the time that both defendants were apprehended, she was charged as a principal in both the attempted robbery and the murder. It may be noted that the psychiatric analysis contained in the probation report on this defendant concluded that her background was such as to cause her to become passive and submissive at times of stress, and that her actions on the night of the shooting were probably almost involuntary from the moment that she became aware of Wade's criminal intent.

On the day set for her trial, Ella Mae, on the advice of the public defender, moved to change her former pleas of not guilty to guilty on the condition that she be given life imprisonment. The motion was granted by the court, and she was thereafter sentenced to life imprisonment on the count charging murder, probation being denied.

The appeals of the two defendants, being based on widely divergent grounds, must be dealt with separately. We shall consider first the appeal of defendant Wade.

As his first assignment of error Wade urges that his conviction must be reversed for the reason that it was based on the uncorroborated testimony of an accomplice, Ella Mae Miller. (Pen. Code, § 1111.)

That section provides: "A conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense. . . ." Wade argues that none of the admissible evidence is sufficient legal corroboration for the testimony of Ella Mae to sustain his conviction. That she was an accomplice to any offense committed is admitted by the prosecution. Corroboration of her testimony is, therefore, necessary, or the conviction must be reversed. (*People* v. *Kempley,* 205 Cal. 441, 456 [271 P. 478].)

The only corroboration necessary for the evidence of an accomplice under the statute is that which tends to connect the defendant with the commission of the crime, not evidence of the corpus delicti. (*People* v. *Simpson,* 43 Cal.2d 553, 563 [275 P.2d 31]; *People* v. *Claasen,* 152 Cal.App.2d 660, 664 [313 P.2d 579].) The corroborative evidence may be slight and entitled to little consideration when standing alone. (*People* v. *Wayne,* 41 Cal.2d 814, 822 [264 P.2d 547].) Defendant's own admissions are sufficient corroboration. (*People* v. *Negra,* 208 Cal. 64, 69 [280 P. 354].) Finally, corroborative evidence may be circumstantial. (*People* v. *Wayne,* *supra,* 41 Cal.2d 814, 822.)

The prosecution presented evidence of a substantial nature which tends to corroborate the testimony of Ella Mae in several respects. Most significantly it produced one William E. Horton, a boy of 12, who testified that he saw the defendant pointing a gun at "the liquor store man" through the window of the store while the witness was across the street. This would seem to be sufficient evidence of an attempt to commit robbery to corroborate Ella Mae on that point. Defendant objects to this testimony on the ground that young Horton told a contradictory story before the trial in that he first said that he saw Sorenson point a gun at the defendant. Such an objection goes to the credibility and weight of Horton's testimony, which are matters properly left for determination by the jury. (*People* v. *Lyons,* 50 Cal.2d 245, 260 [324 P.2d 556].) Horton's testimony was, therefore, properly admitted, and, as it tends to corroborate an element of Ella Mae's testimony, fulfills the requirements of Penal Code, section 1111. Furthermore, the testimony of Mrs. Chen would tend to show, if believed, that Wade went into the liquor store with the intent to commit a robbery therein, and the alleged admissions of the defendant testified to by Officer Sexauer would also support the same conclusion. Objections to the

admission of both of these items of evidence are hereinafter dealt with as independent assignments of error.

Defendant objects to Officer Sexauer's testimony because, he asserts, an admission may be introduced only after the corpus delicti has been independently established. **[4]** It is, however, well settled that the order of proof in a trial is within the discretion of the trial court. (*People* v. *Housman,* 44 Cal.App.2d 619, 627 [112 P.2d 944].) **[5]** The corpus delicti need be established only by prima facie evidence aside from the extrajudicial admissions of the defendant (*People* v. *Rupp,* 41 Cal.2d 371, 378 [260 P.2d 1]).

The conclusion seems inescapable in the light of the foregoing rules that the evidence of the manner in which Sorenson met his death coupled with the testimony of Ella Mae Miller was sufficient to establish that the death of the victim was occasioned through a criminal agency, thereby proving the corpus delicti. It is therefore manifest that the testimony of Officer Sexauer as to the defendant's admissions was properly received in evidence.

As a further assignment of error, Wade urges that the trial court improperly admitted the testimony of Mrs. Chen, the owner of the grocery store in Oakland, which indicated that someone may have attempted to rob her store on the night of the shooting. The relevancy of her testimony was, and the jury was instructed to consider it only in that connection, for the purpose of evidencing Wade's intention to commit a robbery on the night of the shooting and of corroborating the testimony of his codefendant as to that intent.

It is the general rule that evidence of a collateral crime is inadmissible in a criminal prosecution for the asserted reason that its tendency to inflame and prejudice the jury outweighs its evidentiary value. (*People* v. *Albertson,* 23 Cal.2d 550, 576 [145 P.2d 7].) An exception to this rule is found, however, where the evidence of the prior or collateral criminal act is relevant to prove a specific and ascertainable feature of the crime on which the prosecution is founded, such as lack of mistake, motive or intent. The connection of the accused with the collateral offense put into evidence must, however, be clear and convincing. (*People* v. *Albertson, supra,* 23 Cal.2d 550, 577.)

In the present case there are several links which connect the defendant with the collateral crime, and with the testimony of Mrs. Chen. There is her testimony that the person who accosted Mrs. Chen was, like the defendant, a

Negro male, wearing brown clothing; that the person in her store threatened her with a gun concealed in his pocket, as did the defendant in the liquor store according to the testimony of Officer Sexauer, and that Mrs. Chen's store lies along a possible route between the apartment where the defendants resided and the liquor store. There is also the testimony of Ella Mae that the defendant stopped at a grocery store on the night of the shooting, and that when he returned to the automobile he stated that he could not get the cash register open because it was stuck. This is consistent with the testimony of Mrs. Chen that she heard sounds of the cash register being manipulated but that nothing was taken therefrom. Certainly the testimony of Mrs. Chen, together with that of Ella Mae, constitutes substantial evidence of the defendant's connection with the attempted robbery of the grocery store and is relevant to the commission of the murder in that it bears on the defendant's intent on the evening of the crime. There was no error in the admission of this testimony.

■ Defendant next complains of an alleged error in the admission of the testimony of his wife, Lucille. He had testified that he obtained and carried the guns found in his possession including the murder weapon, because of threats made against his life by Pete Guillory, and communicated to him by his wife and others. The evidence of Lucille's mother, Mrs. Byrd, tended to corroborate the statement of the defendant as to the existence of threats allegedly made by Mr. Guillory. In rebuttal, the state called Lucille Wade to the stand to testify on this issue.

Defendant at first interposed an objection to the testimony of the witness under Penal Code, section 1322, but shortly thereafter, in open court, withdrew his objection. He now asserts that the admission of Lucille's testimony was erroneous in that it occurred over her objection. The relevant portions of the transcript, set out in the margin[1] demonstrate that

---

[1]After defendant had waived his objection to having his wife testify, she was called to the stand and the following colloquy occurred:

''Mr. Buckley [Deputy District Attorney]: . . . we want to know whether you waive the privilege and consent to testify.

''Mrs. Wade: No, I don't care to testify. No, I don't want to testify against him.

''The Court: You are not willing to answer the questions that are being asked you?

''The Witness: Yes, if I have to answer. But if I don't, I don't care to answer.

''The Court: Well, it isn't a question of your caring to or not. Do

Lucille did indeed object to being sworn as a witness against her legal husband. In view of the command of section 1322 that "neither husband nor wife is a competent witness for or against the other in a criminal action . . . *except with the consent of both*" (emphasis added) the admission of this testimony was error.

We cannot, however, agree that the error was prejudicial to the interests of the defendant. Lucille's actual testimony was contradictory to that of the defendant only in part. She denied having told him of threats made against him by Pete Guillory, but admitted having told her mother that she feared that Pete would harm the defendant. For this reason, and from an examination of the entire record, including the evidence, we are of the opinion that it is not reasonably probable that the jury would have reached a different verdict had the error not been committed, or that its commission resulted in a miscarriage of justice. (Cal. Const., art. VI, § 4½; *People v. Watson,* 46 Cal.2d 818, 837 [299 P.2d 243].)

 Defendant Wade next objects to the charge to the jury that "Your verdict must be unanimous on the question of guilt or innocence of the defendant as to each count of the information." He asserts that this instruction tended to make each juror believe that he had to agree with the majority of the other jurors even if he, in good conscience, felt otherwise as to the verdict. This court has long held that the right of a juror to disagree in good conscience with his fellow

---

you consent to do so? . . . Are you willing to be sworn, as you have been sworn, and are you willing to tell the truth?

. . . . . . . . . .

"The Court: And do you do it willingly, or are you doing it under pressure?

"The Witness: Well, I am doing it if I have to. . . .

"The Court: Well, courts aren't conducted like that. A witness is called, like you have been, and a wife has to state that she will and is willing to answer the questions truthfully. No one wants you to answer anything but truthfully, whether it be for or against the defendant. Now, are you willing to do that?

"The Witness: Yes."

The consent provided for in the aforesaid statute must be freely and voluntarily given. It cannot be coerced by judicial persuasion. To say that the consent of Mrs. Wade in the case now engaging our attention was freely and voluntarily given does violence to reason and challenges credulity. The conduct of the trial judge cannot be condoned and merits strong disapproval. The interests of justice will be better served if trial judges will simply advise a witness of his or her rights under the law and leave the determination of consent or the withholding thereof to the witness, unimpaired by any urging or suggestion on the part of the judge when the witness, as in the case at bar, declares that she is willing to testify only "if I have to answer. But if I don't, I don't care to answer" and "Well, I am doing it if I have to."

jurors is a matter of universal knowledge among men of average intelligence, such as we must presume jurors to be. (*People* v. *Hill*, 116 Cal. 562, 569 [48 P. 711].) The instruction complained of was, therefore without prejudice to the accused.

As a fifth ground for reversal, Wade contends that the trial court erred in failing to instruct the jury as to the offense of murder in the second degree. At the trial an instruction on second degree murder was requested by defendant's attorney but refused by the court. Defendant did not then advance any plausible theory of the facts of the case to support a verdict of murder in the second degree though he was requested to do so by the court.

He now advances a theory that would, he asserts, justify a verdict of murder in the second degree, to wit: California has the "felony-second degree murder rule" under which a murder committed during the perpetration of, or attempt to perpetrate a felony, other than the felonies enumerated in the statute defining murder in the first degree, shall constitute murder in the second degree. (Pen. Code, § 189; *People* v. *Brown*, 49 Cal.2d 577, 591 [320 P.2d 5], and cases cited therein, in note 3.) Defendant was, at the time of the shooting, on parole from a federal prison under a sentence for the crime of armed robbery. ▮ His mere possession of a gun was a violation of the Dangerous Weapons Control Law of 1923 (Stats. 1923, p. 695, § 2), a felony. If the jury had reasonable doubts as to the fact that Wade was attempting to commit a robbery in the Idora Liquor Store, but considered that the shooting was wrongful then, it is claimed, they could have found him guilty of murder in the second degree under the aforesaid felony-second degree murder rule.

▮ As stated, defendant was unable during the trial to substantiate his requested instruction with the above quoted theory of the facts. This court has often counseled against the giving of instructions not justified by the facts of the case as tending to overburden and confuse the jurors. An instruction, apparently unrelated to the case before it, will be no less confusing to the jury because a theory to connect it to the facts actually exists and later is discovered. It was, therefore, proper for the trial court to disregard the request for the instruction on murder in the second degree.

It is further contended that although no plausible theory was suggested by counsel for giving the requested instruction, the court itself, in the interests of justice, should have fore-

seen that such a theory was applicable, and should have instructed on its own motion. ▮ In determining what instructions a trial court is required to give without request, the rule is usually stated to be that the court has a duty to give instructions on the general principles of law governing the case, even though not requested by the parties, but it need not instruct on specific points developed at the trial unless requested. (*People* v. *Warren,* 16 Cal.2d 103, 117 [104 P.2d 1024].) On final analysis, the question before the court becomes that of determining whether, in relation to the case at bar, second degree murder is a ''general principle of law'' or a ''specific point developed at the trial.'' The cases involving the problem of distinguishing between general and specific points and principles fail to lead to a more refined definition of the general statement of the Warren case.

The rule seems undoubtedly designed to promote the ends of justice by providing some judicial safeguards for defendants from the possible vagaries of ineptness of counsel under the adversary system. Yet the trial court cannot be required to anticipate every possible theory that may fit the facts of the case before it and instruct the jury accordingly. The judge need not fill in every time a litigant or his counsel fails to discover an abstruse but possible theory of the facts.

▮ The most rational interpretation of the phrase ''general principles of law governing the case'' would seem to be as those principles of law commonly or closely and openly connected with the facts of the case before the court. An examination of the cases concerned with this situation will demonstrate the efficacy of this hypothesis. It has, for example, been held in prosecutions for murder that it is error to fail to give an unrequested instruction on manslaughter where the facts of the case would warrant a verdict of guilt as to such offense. (*People* v. *Manzo,* 9 Cal.2d 594, 598-599 [72 P.2d 119] ; *People* v. *Best,* 13 Cal.App.2d 606, 610-611 [57 P.2d 168].) The statutory definition of manslaughter is one which a judge is required to refer to often. Similarly, the problem of the weight of the testimony of an accomplice is of frequent occurrence, one with which judges will normally gain a familiarity. (See *People* v. *Ellis,* 137 Cal.App.2d 408, 414-415 [290 P.2d 266].) Hence, in the manslaughter and accomplice testimony cases, it will normally be no great burden on the trial court to exercise caution to secure the defendant a modicum of protection by ensuring that the principles of law commonly connected with the facts have been applied.

Measured by this test the facts of the instant case do not require or justify a finding of error for failure to instruct the jury on murder in the second degree. Defendant's theory of the case was not one that the evidence would strongly illuminate and place before the trial court. On the contrary, it was so far under the surface of the facts and theories apparently involved as to remain hidden from even the defendant until the case reached this court on appeal. The trial court need not, therefore, have recognized it and instructed the jury in accordance with it. Omniscience is not required of our trial courts.

We turn now to defendant Ella Mae Miller.

She appeals from the judgments of conviction of murder in the first degree and attempted robbery in the first degree on the grounds that they were obtained without according her due process of law; that the sentence of life imprisonment imposed on her was a cruel and unusual punishment, and that she was improperly denied probation. All but the last contention must be held to be without merit.

She was represented by the public defender before and during the proceedings in the trial court and her change in pleas occurred after consultation with counsel. It is, therefore, not contended that she was denied adequate representation or legal assistance. She asserts, however, that her conviction must be reversed because the trial court erred in accepting her change of pleas without having made an examination of her mental competency. Such an examination it is contended, would have revealed that Ella Mae did not understand what she was doing, a circumstance that would render the acceptance of her change in pleas a denial of her right to due process of law. It seems to be alternatively contended that either this defendant was not mentally competent to change her pleas, or that the confession of guilt contained in such change of pleas was "coerced" from her by the police because of her low mental capacity.

Penal Code, section 1368, provides for a hearing on the present sanity of a defendant if, at any time before judgment, the judge entertains a doubt as to that sanity. In *People* v. *Jackson*, 105 Cal.App.2d 811 [234 P.2d 261], cited by defendant, the District Court of Appeal reversed a conviction for arson with orders for the trial court to conduct a hearing on the sanity of the defendant. In that case the reviewing court could say that, on the face of the record, the trial court must have had a doubt as to the sanity of the defendant. In

the Jackson case the defendant had been recently committed as insane by the judge in the arson trial, and the judge had ordered a psychiatric examination of the defendant during the trial. The facts of the instant case are totally dissimilar to those in the Jackson case; the record herein contains only the inference that Ella Mae failed to understand, at first, the questions of the trial court as to her comprehension of the difference in pleas, and the consequences of her pleas of guilty. The conclusion of the dialogue occurring in the trial court indicates that she did understand the situation, and this was apparent to the trial court. On the face of this record we would not be justified in the assumption that the trial court entertained a doubt as to Ella Mae's sanity.

A doubt in the mind of counsel, or anyone else other than the trial court is not sufficient to require a hearing on the issue of sanity under the statute. (*People* v. *Merkouris,* 52 Cal.2d 672, 678-679 [344 P.2d 1].)

If the defendant's argument be construed as a contention that the change in pleas was "coerced" by the police, it is sufficient answer to say that she cites no facts of such coercion other than her low degree of intelligence. Without other facts, this amounts to no justiciable assertion of coercion, and may not be considered as grounds for reversal. (*In re Swain,* 34 Cal.2d 300 [209 P.2d 793].) It must be remembered, further, that Ella Mae was arraigned in open court and was questioned by the judge as to the circumstances surrounding the change in pleas. Her answers at that time would seem to negative any charge of coercion that she now makes.

Also without merit is Ella Mae's argument that the imposition of a life sentence on one with as little actual involvement in the crime as she amounted to a cruel and unusual punishment and a denial of due process of law. (*In re Rosencrantz,* 205 Cal. 534 [271 P. 902].)

To the Legislature is committed the task of determining the proper penalty for breaches of the criminal law, as well as the determination of what acts will constitute a crime, unless the penalty set is "beyond question an *extraordinary penalty* for a crime of *ordinary gravity.* . . ." (*In re Finley,* 1 Cal.App. 198, 202 [81 P. 1041] ; *People* v. *Beatty,* 14 Cal. 566, 573.) Murder while in the commission of a felony may not be said to be a crime of ordinary gravity, nor, under the Rosencrantz case, may life imprisonment be considered an extraordinary penalty.

However, defendant's assignment of error in the ruling

relating to probation after her conviction presents a serious question. It will be helpful here to quote the relevant portions of the transcript. At the time defendant was allowed to change her pleas to guilty, her counsel requested postponement of sentencing so that a probation report might be prepared and studied. The court granted this request and continued the pronouncement of judgment until a later date. In so doing, however, the court said: "The defendant, of course, fully realizing that there is no possibility of probation. . . . I am very certain that she is not eligible, and I am sure she understands it." The court indicated that the probation report might nevertheless, be helpful to the Adult Authority. During the proceedings at which judgment was pronounced the court made it quite clear that her earlier preconception had not, in fact, been changed despite reciting the formula in the language of the statute that "The court has read and considered the report of the Probation Officer. . . ." Defense counsel opened the hearing with a plea for probation. The court then said: "Well, Mr. Nunes, there certainly isn't any doubt in my mind, and I don't think there is any in the mind of the defendant, that before I accepted her plea I very carefully made it clear to her, and she told me that she understood, what the course of the law would be, because I wouldn't have accepted her plea without her understanding . . . . to grant your request would not be at all in accordance with my own interpretation of the law. . . ."

The probation of offenders is provided for in section 1203 of the Penal Code: ". . . in every felony case in which the defendant is eligible for probation, before any judgment is pronounced, and whether or not an application for probation has been made, the court must immediately refer the matter to the probation officer to investigate and to report to the court. . . . The probation officer must thereupon make an investigation of the circumstances surrounding the crime and of the prior . . . history of the defendant, must make a written report to the court . . . and must accompany said report with his written recommendations . . . as to the granting or withholding of probation. . . . *At the time . . . fixed by the court, the court must hear and determine . . . the suitability of probation in the particular case, and in connection therewith must consider any report of the probation officer,* and must make a statement that it has considered such report. . . . If the court shall determine that there are circumstances in mitigation of punishment prescribed by law, or

that the ends of justice would be subserved by granting proba-
tion to the defendant, the court shall have power in its dis-
cretion to place the defendant on probation. . . . Probation
shall not be granted to any person who shall have been con-
victed of . . . murder . . . and who at the time of the perpe-
tration of said crime . . . or at the time of his arrest was
*himself* armed with a deadly weapon. . . ." (Emphasis added.)
■ Probation is, therefore, a power that may be exercised
in the discretion of the court. (*People* v. *Hainline*, 219 Cal.
532, 534 [28 P.2d 16].) But that discretion may not be exer-
cised in an arbitrary or capricious manner. It must be im-
partial, guided by "fixed legal principles, to be exercised in
conformity with the spirit of the law." (*People* v. *Jones*, 87
Cal.App. 482, 493-499 [262 P. 361].) ■ It has, therefore,
been held error to deny probation without determining
whether the statutory requirements for probation were pres-
ent. In *People* v. *Southack*, 39 Cal.2d 578 [248 P.2d 12], and
*People* v. *Johnson*, 140 Cal.App.2d 613 [295 P.2d 493], the
defendants were denied probation after convictions of felonies.
The statute provided at the time of each of the convictions, as
it does now, that a convicted person is eligible for probation
unless he was armed with a deadly weapon at the time of the
commission of the felony. In both cases the trial court denied
the applications for probation without knowing whether the
defendants were, in fact, carrying deadly weapons. In both
cases the reviewing court remanded the cases to the trial court
with directions to entertain requests for probation in con-
formity with the statute.

■ The purport of the statute and the cases is that the
trial court must not decide the question of probation until it
is in possession of all of the relevant facts, especially those
contained in the probation report. There is little question
from the record in the case at bar that the trial judge had
decided the question of probation against the defendant at
the time of granting her request to file an application therefor.
It is clear that the judge did not wait until the report was
completed and submitted to her.

■ The probation officer reported that, had the court
not prejudged the issue, he would have recommended proba-
tion as he considered this case to be an eminently proper one
for such action. Since the defendant herein was not herself
armed with a deadly weapon at the time of the commission of
the offense charged against her, or at the time of her arrest,

she was eligible for probation if the trial court concluded she was worthy thereof.

In this state of the record the cause must be remanded to the court below for the single purpose of entertaining and acting upon defendant's application for probation. (*People* v. *Southack, supra,* 39 Cal.2d 578, 592.)

The record reveals that at the hearing set to order the execution of sentence, after judgment had been rendered, the defendant attempted to withdraw her plea of guilty. She was not joined by counsel in this attempt. The trial court properly ruled that it had no jurisdiction to entertain such a motion after judgment had been entered. (Pen. Code, § 1018.)

As the case is being remanded to the trial court as to this defendant in any event, she will be free to petition for a writ of error *coram nobis,* the proper procedure for a defendant seeking to obtain leave to withdraw a plea of guilty after judgment. (*People* v. *Grgurevich,* 153 Cal.App.2d 806, 810 [315 P.2d 391].)

The judgment of conviction of defendant Wade and the order denying his motion for a new trial are affirmed; as to defendant Miller, the order denying a new trial is affirmed. Since the record discloses that the trial court, without considering the merits of the application for probation, erroneously determined that she was not eligible for probation, the judgment as to her is reversed, and the cause remanded for further proceedings in accordance with law, and with specific directions to the trial court to entertain the application for probation and grant or deny the same as may appear proper under all the circumstances.

Gibson, C. J., Traynor, J., Schauer, J., Spence, J., McComb, J., and Peters, J., concurred.