HERNDON, J.
 

 Appellant Hensling appeals from a judgment of conviction of violation of section 182, subdivision 1, of the Penal Code, in that he conspired with four others, to-wit, defendants Murphy, Cushing, Clothier and Walker, to commit the crime of bookmaking in violation of section 337a of the Penal Code.
 

 The information, containing 16 counts, alleged in count I that appellant, with said others, between March 10, 1960, and May 6, 1960, did conspire, combine, confederate and agree together to keep and occupy a certain place and certain rooms and buildings and to maintain certain books and other paraphernalia for the recording and registering of bets on horse racing and to make and accept bets upon the results of said contests.
 

 Defendants entered pleas of “not guilty” to all counts. Subsequently, Walker entered a plea of guilty to three counts, including count I, and Clothier entered a plea of guilty to count I. The other defendants and their counsel waived trial by jury. By stipulation of all counsel, the cause was submitted on the transcript of the preliminary hearing. After argument and submission, the court found appellant guilty on count I and dismissed all other counts. Defendant Cushing was found not guilty of count I and guilty of count II. Judgment of
 
 *36
 
 conviction was pronounced and appellant was sentenced to state prison for the term prescribed by law.
 

 Statement of Facts
 

 On or about March 1, 1960, a Miss Margaret Keyes was employed as a telephone operator at the Courtesy Telephone Answering Service located at 1238 South Atlantic Boulevard in Los Angeles, operated by defendant Clothier. She was paid a salary together with an extra commission for each new customer obtained by her. On or about March 1, 1960, defendant Murphy, a friend of Miss Keyes, informed her that he had a new customer for the board and asked her “to make arrangements with her boss. ’ ’ He told her that the new client was named Wynn. On March 10, 1960, Miss Keyes received a telephone call from appellant at which time a meeting was arranged for that evening. She met appellant to discuss the details of installation for two lines.
 

 Clothier approved the installation of the two additional lines and then gave her and the other employees instructions as to how the lines were to be operated. He said that appellant was a bookmaker and that incoming lines were to be given specified numbers. He gave instructions that they were to answer the lines as Wynn’s Television, and that each morning they would be notified as to the numbers to which they were to relay the calls. Appellant called Miss Keyes and told her to relay his calls to certain specified numbers.
 

 Two or three days after the lines had been installed, Miss Keyes again met appellant. He offered to pay the rent and telephone bill at her house if she would agree to allow him to place a man therein to use her telephone. She agreed, and several days later turned her key over to defendant Walker. When she came home during her lunch hour and at night, she would observe Walker writing on yellow strips of paper and making telephone calls. Answering incoming calls, he would acknowledge the name of the individual calling, write on the yellow strips of paper and then immediately make an outgoing call. He was heard saying “I have one in the fifth,” or “I have one in the second.” Walker worked every day except Sunday from approximately 10 o’clock in the morning to 6 o’clock in the evening. Miss Keyes testified also that she observed copies of the National Daily Reporter in her home after Walker moved in.
 

 On two separate occasions, Miss Keyes visited appellant’s office in the Arcade Building on Whittier and Atlantic in Bast Los Angeles. Her asserted purpose was to borrow money
 
 *37
 
 against the rent that appellant had agreed to pay. She observed that appellant would receive telephone calls and write on a glass table top with a black crayon. He would then make calls out. He would then take some fluid from a can of lighter fluid, pour it on the writing, and wipe the writing off with a tissue. He once made the statement that there was no evidence since nothing could be seen. She observed copies of the National Daily Reporter in appellant’s office.
 

 On April 30, 1960, a Sergeant Seltzer, a deputy sheriff in Los Angeles County, and another officer called at the Courtesy Answering Service. He told Miss Keyes and some of the other operators that the telephone lines were being used in a bookmaking operation and requested information. Miss Keyes then accompanied the officer to her home in East Los Angeles and voluntarily admitted them. In the home they found copies of the National Daily Reporter with writing on them as well as white and yellow strips of paper, also with writing on them, apparently left there by Walker. Miss Keyes allowed the officers access to the house and made no objection to their taking the various papers. Later, Miss Keyes voluntarily went to the East Los Angeles Sheriff’s Station presumably to furnish additional information. She testified that at that time she was doing work for several law enforcement agencies, including the Intelligence Detail of the Sheriff’s Department.
 

 From May 1 to May 6, Miss Keyes continued working at the answering service and continued receiving telephone calls from appellant telling her where to connect his incoming calls and she did the actual connecting. Appellant told her to listen in on his calls and to disconnect immediately if she thought anybody else was listening in.
 

 On May 6, 1960, at approximately 4:30 p. m., Sergeant Seltzer and Deputy Sheriff Rose Marie Rodriguez went to the Courtesy Telephone Answering Service. Sergeant Seltzer instructed Deputy Rodriguez to answer the telephone and Miss Keyes showed her the trunk lines which had been assigned to appellant and told her how they were operated in accordance with appellant’s instructions. Deputy Rodriguez took incoming calls, answering as appellant had directed Miss Keyes, and transferred them to the relay numbers which appellant had given Miss Keyes. At about 4:30 p. m., Seltzer received a telephone call from Deputy Allender and, in answer to that call, Seltzer placed outgoing calls from the board to appellant’s relay numbers which Allender received and answered.
 

 
 *38
 
 On the same date and at approximately the same time that Officers Seltzer and Rodriguez paid their visit to Courtesy, Deputy Sheriffs Allender, McFee and Frawley went to appellant’s office on Whittier Boulevard and arrested appellant and Cushing. Deputy Allender, stipulated to be an expert in the field of bookmaking, found the following items: (1) two telephone bills in appellant’s name dated April 19, 1960, for calls made to appellant’s relay numbers; (2) a blue-backed notebook containing notations which in Allender’s expert opinion constituted a code used hy bettors or agents calling into a particular telephone location or relay; and (3) four telephones on two lines.
 

 Deputy Allender confirmed the telephone numbers by calling Sergeant Seltzer and having him call back on each of the individual lines, telling him the number that Seltzer had used. Allender also received calls that came in on the telephones. He would answer some calls that came in by saying “Go ahead” and in these cases, the caller would hang up. However, whenever he answered the calls by giving the code name which he found in the blue notebook, the caller would place his or her bet. Allender testified to his opinion that the activity carried on at appellant’s office was what is known in book-malting circles as a “relay spot,” i.e., a place where a bettor calls and the receiver of the call records the bet temporarily in some fashion, as by writing with a grease pencil on some hard substance, and then, before each post, calls another office and places the bet.
 

 Deputy McFee found the following items in appellant’s office: a 2-foot circular mirror, two grease pencils, two cans of lighter fluid, three towels, two telephones without dial plates, a blue-backed notebook, two National Daily Reporters, both dated May 6, 1960, and a large pane of glass located on a desk. On appellant’s person, he found a receipt from the Courtesy Service which was an estimate for a switchboard appellant wanted to have installed.
 

 When Deputy McFee asked appellant if he were making book at the location, appellant answered that he was not, but did admit that the notebook and the writing therein were his own. All counsel stipulated that John Harris was a qualified expert in the comparison of handwriting and that, if called as a witness, he would testify that he had compared the writing in the blue notebook and the handwriting exemplar of appellant and that, in his expert opinion, the writing of both exhibits was made by the same person.
 

 
 *39
 
 It was also stipulated that if Mr. Harris were called he would testify that he had compared the handwriting on the National Daily Reporters and the yellow slips attached thereto (which were found by Officer Seltzer in the home of Miss Keyes on April 30, 1960) with the handwriting appearing on the National Daily Reporters and the attached slips (which were found by Deputy Eden when he arrested Walker on May 6, 1960, at 1109 College View Drive) and with the handwriting that appeared on an exemplar card and that, in his opinion, the handwriting on all three exhibits was that of Walker.
 

 On May 6, 1960, at approximately the same time that other deputies were visiting at the Courtesy exchange and at appellant’s office, Officers Eden, Sitz and Cornwall entered the premises at 1109 College View Drive in Monterey Park and arrested Walker. Officer Eden testified that he had seen appellant drive a metallic green 1957 Lincoln Continental bearing a state license number and that the car was registered at 1109 College View Drive, Monterey Park.
 

 Sergeant Greenlees, who was stipulated to be an expert in the field of bookmaking, found Walker with bookmaking paraphernalia, including a copy of the National Daily Reporter with writing on it and with some yellow markers attached bearing a series of numbers indicating races. Walker admitted taking bets over the telephone from several bookmakers. Walker admitted obtaining the key to the place he occupied from appellant, “his boss,” who had made the arrangements with the person living at that location. Greenlees testified to the opinion that the activity carried on at that place was what is known in bookmaking circles as a “book office,” i.e., a bookmaker’s headquarters, or a place where their records are kept. Appellant did not testify in his own behalf.
 

 Statement of Issues
 

 Appellant’s entire argument is based upon his contentions that (1) without the testimony of the witness Keyes, the State failed to make out a case of conspiracy against him; (2) Miss Keyes was shown to be an accomplice and a co-conspirator; and (3) the testimony of Miss Keyes was not corroborated by sufficient evidence to satisfy the requirements of section 1111 of the Penal Code which reads as follows:
 

 “A conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of
 
 *40
 
 the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof.
 

 “An accomplice is hereby defined as one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given. ’ ’
 

 Respondent contends that: (1) Miss Keyes was only a “feigned” accomplice in that she pretended complicity in the crime and voluntarily furnished information to the investigating officers in order to aid them in detecting and prosecuting the participants; (2) it is established law that the testimony of a feigned accomplice requires no corroboration; and (3) that, even if Keyes were an accomplice, there was sufficient corroborating evidence to sustain appellant’s conviction.
 

 The Witness Keyes Was a Feigned Accomplice
 

 It is settled law that a feigned participant is not an accomplice since his purpose in feigning complicity in the commission of a crime is to detect and prosecute the perpetrators thereof, and that his testimony need not be corroborated.
 
 (People
 
 v.
 
 Piascik,
 
 159 Cal.App.2d 622, 627 [323 P.2d 1032];
 
 People
 
 v.
 
 Griffin,
 
 98 Cal.App.2d 1, 22 [219 P.2d 519];
 
 People
 
 v.
 
 Grijalva,
 
 48 Cal.App.2d 690, 695 [121 P.2d 32];
 
 People
 
 v.
 
 Hicks,
 
 62 Cal.App.2d 859, 861 [145 P.2d 689].) Where the evidence is conflicting as to whether a witness was an actual or feigned accomplice, the issue must be determined by the trier of the facts whose determination based on substantial evidence is conclusive.
 
 (People
 
 v.
 
 Griffin, supra,
 
 98 Cal.App.2d 1, 22;
 
 People
 
 v.
 
 Bolanger,
 
 71 Cal. 17, 20 [11 P. 799];
 
 People
 
 v.
 
 Spaulding,
 
 81 Cal.App. 615, 618 [254 P. 614].)
 

 Unquestionably, the trial court’s finding that Miss Keyes was a feigned accomplice from the very outset
 
 [1]
 
 is supported by substantial evidence, and particularly by the uncontradicted testimony hereinafter quoted. After a discussion between court and counsel with reference to the evidence, and particularly the testimony of Miss Keyes, the trial judge indicated his views, concluding with the statement, “I don’t think corroboration is needed.”
 
 Thereupon, counsel for appellant stated with reference to Miss Keyes:
 
 
 *41
 

 “I think she is obviously a feigned
 
 accomplice.” (Emphasis added.)
 

 The record shows that on April 30, 1960, sheriff’s officers requested the aid of Miss Keyes in obtaining information regarding bookmaking activities which they understood were being carried on at her place of employment. She gave them certain information, voluntarily accompanied them to her home in East Los Angeles, admitted them, allowed them unrestricted access, and permitted them to take whatever evidence they desired, including the various papers left there by Walker. Later, she voluntarily went to the East Los Angeles Sheriff’s Station for an undisclosed purpose, but it may be inferred from all the circumstances that she was acting in conformity with an existing intent to perform in the capacity of a feigned accomplice.
 

 In the course of her direct examination, Miss Keyes testified:
 
 “Q. Were you working at the time you were employed at the Telephone Answering
 
 Service,
 
 [2]
 

 were you doing any work for any law enforcement agencies? A. Yes, sir. Q. What law enforcement agencies? A. The Intelligence Detail of the Sheriff’s Department, the Federal Bureau of Investigation, and the Narcotics Squad. Q. Were you working for these organizations when the calls were made, or the activities were undertaken putting in Hensling’s lines?
 

 [3]
 

 A. Yes, sir.”
 
 Referring to a date on or about May 6, 1960, the witness testified on cross-examination as follows:
 
 “Q. Were you at that time an informer for the Sheriff’s Office of Los Angeles County? A. I was working for the District Attorney’s Office.
 
 Q. I don’t believe you have answered my question. A. (No audible response.)
 
 Q. Once again, were you an informer for the Sheriff’s Office, Los Angeles County, at or about the time of this conversation we have referred to that occurred on May 6, 1960? A. Yes, I was.”
 
 (Emphasis added.)
 

 There Was Sufficient Evidence to Corroborate the Testimony of the Witness Keyes
 

 Finally, it must be apparent from our recital of the evidence that even if the witness Keyes were regarded as an actual and not a feigned accomplice, there was more than
 
 *42
 
 sufficient corroborating evidence to convict appellant of the crime of conspiring to commit the crime of bookmaking. As stated in
 
 People
 
 v.
 
 Buono,
 
 191 Cal.App.2d 203, 215-216 [12 Cal.Rptr. 604] : “It is important here to keep in mind the familiar rule that the corroboration required by Penal Code, section 1111 does not include the corpus delicti and is confined to the matter of connection of the individual defendant with the crime. . . . These rules are applicable to conspiracy as well as any other crime. It is a distinct crime in itself
 
 (People
 
 v.
 
 Robinson,
 
 43 Cal.2d 132, 138 [271 P.2d 865]), defined by section 182, Penal Code. The testimony of an accomplice is sufficient to establish the fact of conspiracy; he or she needs corroboration only with respect to defendant’s connection with it.”
 

 And as our Supreme Court declared in
 
 People
 
 v.
 
 Wade,
 
 53 Cal.2d 322, 329 [1 Cal.Rptr. 683, 348 P.2d 116]: “The only corroboration necessary for the evidence of an accomplice under the statute is that which tends to connect the defendant with the commission of the crime, not evidence of the corpus delicti.
 
 (People
 
 v.
 
 Simpson,
 
 43 Cal.2d 553, 563 [275 P.2d 31];
 
 People
 
 v.
 
 Claasen,
 
 152 Cal.App.2d 660, 664 [313 P.2d 579].) The corroborative evidence may be slight and entitled to little consideration when standing alone.
 
 (People
 
 v.
 
 Wayne,
 
 41 Cal.2d 814, 822 [264 P.2d 547].)
 

 Defendant’s own admissions are sufficient corroboration. (P
 
 eople
 
 v.
 
 Negra,
 
 208 Cal. 64, 69 [280 P. 354].)
 

 Finally, corroborative evidence may be circumstantial.
 
 (People
 
 v.
 
 Wayne, supra, 41
 
 Cal.2d 814, 822.) ”
 

 The evidence need not corroborate the accomplice as to every fact to which he testified, but is sufficient if it tends to connect the defendant with the commission of the offense in such a way as reasonably may satisfy a jury that the accomplice is telling the truth.
 
 (People
 
 v.
 
 Lyons,
 
 50 Cal.2d 245, 257 [324 P.2d 556].) Our recital from the lengthy record demonstrates that there is more than sufficient evidence to corroborate the testimony of the witness Keyes to the extent required by section 1111 of the Penal Code and by the controlling authorities above cited and quoted.
 

 The judgment is affirmed.
 

 Fox, P. J., and Ashburn, J., concurred.
 

 [1]
 

 The information alleges that the beginning of the conspiracy was March 10, 1960,
 

 [2]
 

 2Miss Keyes was employed by the Courtesy Telephone Answering Service on or about March 1, 1960. On that date defendant Murphy informed her that he had a new customer for the board and asked her “to make arrangements with her boss [Clothier].”
 

 [3]
 

 3On or about March 10, 1960, Miss Keyes met appellant to discuss the details of the installation of two telephone lines.