[Crim. No. 12235. Second Dist., Div. Five. Feb. 5, 1969.]

THE PEOPLE, Plaintiff and Respondent, v. BERNARD FRANCIS STEVENS, Defendant and Appellant.

Richard L. Knickerbocker, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and David W. Halpin, Deputy Attorney General, for Plaintiff and Respondent.

KAUS, P. J.—A jury convicted defendant of grand theft (counts I and IV), and burglary (counts II and III). The court granted probation on various conditions, one of them being that defendant spend 90 days in the county jail. Defendant appeals.

The facts are quite simple. Defendant met Mrs. M., the victim of the two theft counts, early in 1965. A warm relationship ensued. While Mrs. M. was hospitalized defendant helped her with the sale of an apartment house complex owned by her. In this connection defendant gained possession of two general powers of attorney signed by Mrs. M. The net effect of the real estate transaction was that Mrs. M. received two purchase money notes, secured by junior deeds of trust. Each note had a face amount of $35,000. Mrs. M.'s interest in the two notes was eventually lost in foreclosure proceedings.

Defendant kept the powers of attorney. On September 13, 1965, he entered a branch office of the Home Savings and Loan Association, presented a pass book to an account owned by Mrs. M., together with one of the powers of attorney, and attempted to close the account. The balance in the account was about $7,500. An officer of the association refused to honor the power and gave defendant an association form for Mrs. M. to sign. Defendant did not return. (Count II.)

On September 24, 1965, defendant took Mrs. M.'s 1964 Cadillac and failed to return it. On September 16, 1965, he had used one of the powers to cause the Department of Motor

Vehicles to transfer the automobile to his own name. (Count I.)

Mrs. M. was the owner of a purchase money note and deed of trust secured by a different piece of real property, in the amount of $38,433.65. The maker of that note was a Doctor Meilstrup who had been making regular payments of $500 a month through the Continental Bank on Sunset Boulevard in Los Angeles County. On September 21, 1965, defendant entered the office of the bank. (Count III.) He produced one of the powers and persuaded an employee to release the Meilstrup note to him. (Count IV.) Seven days later a person who identified himself as defendant's attorney called Doctor Meilstrup and requested that further payments on the note be made to defendant through the attorney's office.[1]

The defense simply was that the use and attempted use of the powers was with the permission of Mrs. M. According to the defendant he had rendered services to Mrs. M. in connection with the sale of the apartment complex and had also acted as her business manager. She had promised him half of the proceeds of the sale,[2] plus compensation for his other services. Mrs. M.'s recollection was different. She assumed that defendant was volunteering his services because he was in love with her. She trusted him. She never gave him permission to use the powers to acquire the Home Savings and Loan account, the automobile or the Meilstrup note. The sole reason why the powers were given to defendant was for use in connection with the sale of the apartment complex.[3]

On appeal the sufficiency of the evidence is conceded. Defendant claims, however, that the judgment must be reversed for several reasons.

---

[1]There was no objection to this testimony, which is entirely consistent with the defense posture at the trial.

[2]Defendant never made it very clear whether he was to receive $35,000, regardless of the value of the purchase money notes, or simply one of the two notes. As noted, the difference between the two methods of compensation was $35,000. At one point he said: ''She said that half of it was mine. Now what it meant I really couldn't answer that.'' When it was discovered that the ''notes . . . were having problems,'' Mrs. M. just told him not to worry. In reply to a question from the court, directed to the same ambiguity he replied: ''Half of 70,000, your Honor, and if you will take the other note, it's not cash I have because there is no—I mean I wanted in case we had any discretion or discussion about it, I didn't want to have anything like that, your Honor. . . .''

[3]Mrs. M. did not even concede that she had signed a general power of attorney, but insisted that a power of attorney she had signed contained the phrase: '' 'Limited power of attorney . . . for the sale of the . . . apartments, only good for one day only.' '' No such special power was ever produced. It is not seriously contended that her testimony on that point was correct.

 First it is claimed that the court, *sua sponte,* should have instructed the jury to the effect that if defendant took the automobile and the Meilstrup note and attempted to convert the Home Savings and Loan account to his own use because he, in good faith, claimed the right to do so, he could not have been guilty of theft or of intending to commit that crime, and, therefore, not guilty of burglary when he entered the two financial institutions. He relies on *People* v. *Butler,* 65 Cal.2d 569, 572-574 [55 Cal.Rptr. 511, 421 P.2d 703] for the proposition that a bona fide claim of right negatives the felonious intent which must accompany the taking, and on *People* v. *Ford,* 60 Cal.2d 772, 792-793 [36 Cal.Rptr. 620, 388 P.2d 892] for the contention that an instruction on that defense should have been given on the court's own motion.

It is noted that any defense based on a non-consensual taking under a claim of right would have been incompatible with the defense as actually put forth, that is to say a taking with the express permission of Mrs. M. The only evidence which might permit an inference that defendant took Mrs. M.'s properties under a claim of right is contained in a letter which he wrote to her on September 24, 1965, and which was offered by the People. The letter reads as follows:

"My Darling [T.], from B.F., Subject, Us.

"You have asked me repeatedly to leave and said you never loved me. I told you if you kept on saying it, one day it would happen. Now you have your wish. Where I am going I don't know but will advise you later.

"While you were in the hospital, you gave me the power of attorney to act on your behalf in the sale of the [apartment complex] (worth $1,400,000.)

"You said I did nothing for you, but as your business manager we did nothing but make money. You never paid me, as you promised. All I received was love, kisses, partial board and room, plus some clothes and $300 as final payment on my divorce.

"Now after selling my $600 T.V. set, and many other expensive items and receiving no consideration on the sale of the [apartment complex] or as your business manager *there have been steps taken to acquire this consideration.*

"If you have any objections you may contact [my attorney] . . . and take action appropriately." (Italics added.)

Quite clearly the revelation that defendant had taken steps to acquire the "consideration" which he claimed to have coming was highly impeaching of his basic defense, that

everything he did was with Mrs. M.'s permission. His explanation of that statement and of the next paragraph of the letter sounded lame: "I felt if she had any objections, that she could contact [my attorney] because I was going up north, by then and I had no place where I could be contacted, and [my attorney] could be contacted. He in turn—Well, I called [Mrs. M.], too, but I thought possibly if she felt that I wasn't getting a fair amount, she could talk to [my attorney] about it."

Although there is considerable doubt in our mind whether a vague unliquidated claim for services rendered falls within the ambit of the *Butler* doctrine (cf. *People* v. *Poindexter,* 255 Cal.App.2d 566, 570 [63 Cal.Rptr. 332]), we will assume for the sake of argument only that it does. Still, we see no error in failing to instruct the jury *sua sponte* on the claim of right "defense."[4]

We are not dealing with the failure of the court to instruct on an essential element of the crime,[5] as was the case in *People* v. *Ford, supra,* 60 Cal.2d 772, 792-793. This case comes well within the doctrine that while *sua sponte* instructions must be given on general principles of law governing the case, they need not be given on specific points developed at the trial. (*People* v. *Bevins,* 54 Cal.2d 71, 77 [4 Cal.Rptr. 504, 351 P.2d 776]; *People* v. *Wade,* 53 Cal.2d 322, 334-335 [1 Cal. Rptr. 683, 348 P.2d 116].) As in *Wade,* the "claim of right" theory was "under the surface of the facts and theories apparently involved." (53 Cal.2d at p. 335.) As the evidence concerning the alleged claim of right developed at the trial, it was more or less of a disaster for the defense. In the absence of a specific request for an instruction thereon, it should not be turned into an appellate triumph.

Perhaps anticipating failure on his first point, defendant then argues that he was denied the effective assistance of counsel when no instruction on the claim of right theory was requested. The argument has no merit. Defendant

[4] Strictly speaking, we are not discussing a defense, but a state of mind which is inconsistent with *animus furandi,* a necessary element of the People's case. (*People* v. *Butler, supra,* at p. 572.)

[5] The court gave the standard instructions concerning the specific intent necessary for larceny (CALJIC No. 221), embezzlement (CALJIC No. 224) and larceny by trick and device (CALJIC No. 223). CALJIC No. 226 (revised), which defines the specific intent that is an element of theft by false pretenses was not given, in fact the only instructions which mentioned false pretenses were CALJIC 231 and 240. No claim is advanced that the jury instructions on that species of theft were improper.

had a fairly straightforward, if somewhat incredible defense, when he claimed that he had been given permission to use the powers to effect the transfers. Counsel may well have been afraid to muddy the waters with another antagonistic theory which, realistically, could not help his client unless the jury disbelieved him. The question was one of tactics. (*People* v. *Reeves*, 64 Cal.2d 766, 773 [51 Cal.Rptr. 691, 415 P.2d 35].)

■ It is claimed that both the court and the prosecution committed prejudicial misconduct in connection with the following incidents.

Stanley Poster, Mrs. M.'s attorney at the time of the sale of the apartment complex, was one of the witnesses for the People. He testified to the execution of one of the powers of attorney. Without objection he was permitted to explain the function of a power of attorney to the jury. Cross-examination touched on the fact that Poster had been able to recall notarizing only one of the two powers.[6] Then there were more questions about the nature of a general power of attorney, as distinguished from a special power. This time the prosecution failed to object. The discussion then got into the field of using powers of attorney to facilitate the making of gifts to the holder of the power. Poster correctly claimed that this would be "highly irregular . . . awkward, unusual." The defense and Poster then explored powers coupled with an interest and the law of ostensible agency. This ended the instructional phase of Poster's testimony for the moment.

Defense counsel then developed that he had caused Poster to be served with a subpoena duces tecum, calling for his notarial records covering the time when the powers were executed. Poster said he had no such records because he only notarized three or four documents a year. He generally made notations in the file and those were the only records he had. The following then took place: "Q. Are you familiar with the Government Code as it respects notaries? [DEPUTY DISTRICT ATTORNEY]: Your Honor, I am going to object to this.

[6] "Q. Is it possible that in your daily routine an individual might come to your office or you might go to them and notarize a document and forget that you had the transaction in the rush of your business? A. I suppose it's possible, yes. Q. Possible that there may even have been letters that you may have written, that confronted with them you would only be able to say yes, I believe that is my signature but I don't remember having sent the letter? A. Yes. Q. So it's possible, then, that you may have prepared, as you have indicated in your previous testimony, more than one general power of attorney and notarized more than one general power of attorney? A. I believe I must have, counsel, because as far as I can tell, those are my signatures."

476

[DEFENSE COUNSEL] : I think it goes to Mr. Poster's recollection of the execution of one or more powers of attorney and particularly it is relevant in time since he does not have the records of his actions although he recalls that this—THE COURT: That particular section referred to which requires a notary to keep records of all transactions? [DEFENSE COUNSEL] : Yes. THE COURT: *I never heard of any notary that did. I don't think it's*—[DEFENSE COUNSEL] : I will withdraw the question. THE COURT: Okay." (Italics added.) The court's italicized remark is assigned as misconduct.

This is truly a storm in a tea cup. The only possible point of the cross-examination was to discredit Poster's lack of memory with respect to the second power. Since the existence of that power was never really in issue and both powers were eventually admitted in evidence, no conceivable harm was done.

The next claim is more serious. The following occured during Poster's redirect examination: "Q. All right, and another question here on this business of using powers of attorney for gifts. Isn't it true that if an agent deals with a principal's property and acquires ownership of that property, it prima facie will appear to be fraudulent? [DEFENSE COUNSEL] : I object, your Honor. THE COURT: Sustained. Q. [DEPUTY DISTRICT ATTORNEY] : Isn't it true that there is a presumption against the validity of a gift by the principal to the agent? [DEFENSE COUNSEL] : I object. THE COURT: Well, I think we are getting into an advanced course in principal and agent in a law school. If you people want to go to law school, we can take care of it, but the more we get into this thing, I think we are getting into complexities which, as I say, is true, of course, *if I adduce that it is in the area of a fiduciary transaction, it is presumed to be tainted with fraud if the fiduciary receives any advantage whatsoever, but this is a little bit beyond the scope of this case, I believe.* [DEPUTY DISTRICT ATTORNEY] : Very well, your Honor. I have no further questions . . . ." (Italics added.) There was no objection to the court's remarks at the time, although it is now claimed that they constituted misconduct. Since any adverse effect on the jury could easily have been dissipated by an appropriate instruction the failure to object below must be deemed fatal to the contention on appeal. (*People* v. *Cole*, 177 Cal.App.2d 458, 461-462 [2 Cal.Rptr. 190].)

Unfortunately this was not the end of the matter. Near the close of the deputy district attorney's rebuttal argument, we

find her making the following remark: ". . . And a little bit about Mr. Poster. Remember some of the things that Mr. Poster testified about, and counsel seems to rely on him as a somewhat less biased witness than the other People's witnesses. Mr. Poster said it's highly irregular to transfer property using a power of attorney, that is, to the agent himself, highly irregular, but counsel, I wouldn't do it that way. *You can remember his comments in that regard, and you may remember the Court's statement from the bench. Well, yes, when there is a fiduciary*—He says we don't want to give these people a law school course. They probably heard enough *—but when you have a fiduciary relationship it is presumed to be fraudulent,* I don't recall the Court's exact words, but words to that effect, if suddenly the agent has the principal's money. . . ." (Italics added.)

It is hard to believe that any prosecutor assigned to felony trials could be so naive as to believe that a trial court's offhand remarks on the law while sustaining an objection are an appropriate basis for argument to the jury.[7] It is, however, true that even intentional misconduct of a prosecutor only calls for reversal if, in our opinion, it has resulted in a miscarriage of justice. (*People* v. *Hamilton,* 60 Cal.2d 105, 119 [32 Cal.Rptr. 4, 383 P.2d 412].) Further, there was no objection or motion to strike. This failure brings into play the principle of *People* v. *Perez,* 58 Cal.2d 229 [23 Cal.Rptr. 569, 373 P.2d 617, 3 A.L.R.3d 946], that the misconduct will not justify a reversal unless the case is closely balanced and there is grave doubt of defendant's guilt and the misconduct is such as to have contributed materially to the verdict or where the remark is such that a harmful result could not have been obviated. (58 Cal.2d at p. 247.) We do not think either exception to the general rule applies here. The case was not close at all and it would have been very easy for the court to cure the misconduct.

Finally, complaint is made with respect to the following

---

[7] We are not particularly concerned with the correctness of the court's statement of the law. The presumption of section 2235 of the Civil Code to the effect that any transaction between a trustee and a beneficiary by which the trustee obtains an advantage from the beneficiary is presumed to be entered into by the beneficiary without sufficient consideration and under undue influence, has been held applicable to criminal cases. (*People* v. *Hewlett,* 108 Cal.App.2d 358, 369, 375 [239 P.2d 150].) It also appears that while section 2235 only speaks of a lack of sufficient consideration and undue influence, case law has somewhat expanded its application into the field of fraud, at least the constructive variety. (*Vai* v. *Bank of America,* 56 Cal.2d 329, 342 [15 Cal.Rptr. 71, 364 P.2d 247]; *Copeland* v. *Rabing,* 110 Cal.App.2d 631, 637 [243 P.2d 119].)

episode at the trial: defendant had called a real estate broker as his witness. The purpose of producing him was to show the scope of plaintiff's activities on behalf of Mrs. M. The following happened during the cross-examination: "Q. And if any other persons participate in these negotiations, they do not become entitled to commissions, do they? A. No, they do not. [DEFENSE COUNSEL]: Object, your Honor. Not only is the prosecution extending into an area that is not necessarily within the witness' scope of knowledge but it's also a leading question into an untrue area of the law. . . . May I ask the court take judicial notice of Section 10133 of the Business and Professions Code specifically excluding certain persons from the requirement of having real estate license. THE COURT: Well, I don't think, . . . it would be proper for you to ask this witness' opinion on a question of law. You can ask him any question bearing on this particular negotiation, execution of this agreement, this exchange agreement."

Defense counsel was, of course, entirely correct. Section 10133, subdivision (b) of the Business and Professions Code does, under certain conditions, permit a nonlicensed person to earn a fee for participating in a real estate transaction if he holds a power of attorney from the owner. (See *Riley* v. *Chambers,* 181 Cal. 589, 597-598 [185 P. 855, 8 A.L.R. 418]; *Hayter* v. *Fulmor,* 66 Cal.App.2d 554, 560-561 [152 P.2d 746].)[8] But counsel never moved to strike the negative answer which was already in, nor did he request an instruction on the point.

The trial below was not flawless, but defendant's guilt is so plain that we must apply the constitutional mandate (Cal. Const., art. VI, § 13) not to reverse unless in our opinion there has been a miscarriage of justice. Obviously there was none.

The judgment (order granting probation) is affirmed.

Stephens, J., and Aiso, J., concurred.

---

[8]This general statement should be taken with a grain of salt by anyone contemplating going into business as a real estate broker without a license. (See 18 Ops. Cal. Atty. Gen. 200.)