[Crim. No. 8013.   Second Dist., Div. Four.   May 11, 1962.]

THE PEOPLE, Plaintiff and Respondent, v. ROBERT CARL DANIELSON, Defendant and Appellant.

Max Solomon and John J. Bradley for Defendant and Appellant.

Stanley Mosk, Attorney General, and S. Clark Moore, Deputy Attorney General, for Plaintiff and Respondent.

BURKE, P. J.—In an indictment returned by the grand jury appellant Robert Carl Danielson, Roger Lloyd Schad and Patrick Joseph Reilly were charged in Count I with the crime of bribery, a violation of section 68 of the Penal Code of the State of California; in Count II with soliciting another to join in the crime of bribery, a violation of section 653f of the Penal Code; and in Count III with the crime of conspiracy, a violation of section 182 of the Penal Code. The defendants were tried by a jury and found guilty as charged. Appellant's motion for a new trial was denied, as was his application for probation. Appellant was sentenced to state prison for the term prescribed by law on each count with the sentences to run concurrently. He appeals from the judgment and from the order denying his motion for a new trial.

Following is a brief statement of the facts presented to the court and jury. On November 17, 1960, at around 6 o'clock in the evening Dr. Verdin Chivers, a chiropractor, who had been dining at the Dinnerhorn Restaurant in Covina, left the restaurant without paying his bill. Dr. Chivers had been drinking and had been at the restaurant approximately three hours. When confronted by the manager with respect to the bill before leaving the premises the customer asserted that the money to pay the bill had been left on the table. The police were notified and shortly after the doctor left the restaurant he was stopped by a Covina police officer. Dr. Chivers was advised by the officer that he was being arrested on a drunk-driving charge. He was uncooperative and was removed forcibly from his automobile. He was taken to the police department and booked.

At around 6:30 on that evening a Mrs. Margaret Cline received a telephone call from a person who identified himself as Robert Schad and asked for her husband, Dr. Cline. Dr. Cline returned the call around 7:15 p. m. Defendant Schad told Dr. Cline of the arrest of his friend, Dr. Chivers, and that he (Schad) knew a person who could get the charge changed, from "drunk driving" to "drunk in auto," for a

certain amount of money. He asked Dr. Cline how much he thought Dr. Chivers would be responsible for to have the charge changed. Dr. Cline stated he would contact Dr. Chivers' wife and speak to her about it and would call Schad back. When he called, Mrs. Chivers was not in. After conferring with his nephew, Sergeant McCain, a deputy sheriff, Dr. Cline called Schad and told him to offer this person $100 and see if that would be sufficient. Schad agreed and said he would return his call. At around 8:45 p. m. Schad advised Dr. Cline that the party had said "$100.00 wasn't nearly enough and that the fine for that charge was $263.00 and that the person wanted $250.00." Dr. Cline asked how Schad could guarantee, if the money were given, that Dr. Chivers' charge would be dropped or changed from "drunk driving" to "drunk in auto." Schad stated he could not give him any name "but that it was a city official." Dr. Cline stated he would get in touch with Mrs. Chivers and let him know after a while.

Sergeant McCain then called the Dinnerhorn about 9:15 p. m. and asked for defendant Schad, who was employed as a bartender, saying he was a friend of Dr. Chivers. Schad told McCain that it would take $250 to get him released. When Sergeant McCain stated it was too much money Schad stated that it was the least money the man would take. McCain agreed to call him back. Schad stated he could guarantee that Dr. Chivers would be turned loose with no charges filed.

Between 10 and 10:15 p. m. Dr. Chivers was taken out of his cell in the jail at Covina by appellant Danielson who identified himself as the chief of police. He informed Dr. Chivers that he (Dr. Chivers) had some very good friends at the Dinnerhorn Restaurant who wanted to see him out of jail. The appellant told Dr. Chivers that he had been informed that Chivers had given the officers "a bad time."

When Dr. Chivers testified at the trial concerning this conversation he stated, "I asked him [the defendant] who my friends were and he hesitated at that time to mention any names. I asked him at that time if it was Roger Schad because I had known Roger Schad would put up bail for me and he hesitated to mention any names except that I should see him later on, that I should see Roger Schad. . . ." Appellant asked Dr. Chivers if he would sign a statement to the effect that the officers had probable cause to arrest him, as a protection for the officers. When Dr. Chivers asked appellant

if this would be the end of it the appellant assured him affirmatively.

Sergeant McCain called Schad later that night at around 10:30. He told Schad he could not raise the $250 at that time but would guarantee him the money and would bring it over the next day. He asked how "they" could be assured that no charges would be filed against Dr. Chivers in court and Schad stated that the money would be given to a man who was in position to have Dr. Chivers turned loose with no charges refiled and that he didn't have to worry about it. They arranged for a meeting the following afternoon.

At around 1:35 p. m. the next day, November 18, Sergeant McCain saw Schad at the restaurant. McCain identified himself as the person who had spoken to Schad the previous evening. Defendant Reilly, who like Schad was employed at the restaurant as a bartender, was also present. Schad was off duty at the time and sat with McCain at the bar. They then went to a booth where they talked. McCain told Schad he had the money with him. After considerable conversation McCain again asked how he could be sure that Dr. Chivers would not be brought back into court or a complaint filed. Schad told him it was the chief of police who was handling the deal and that there was a four or five-way split. Schad stated that Dr. Chivers had been released immediately after McCain had talked to him the evening before. McCain asked Schad if he wanted to take the money in the booth and Schad suggested they go out to the parking lot. They went to Schad's car and there Sergeant McCain handed Schad the money which he counted and said was just right. Schad placed the money in an envelope and put it in his pocket. They then parted.

Deputy sheriffs observed Schad leaving the restaurant, followed him and placed him under arrest. When it was discovered that Schad did not have the money in his possession other deputy sheriffs were dispatched to arrest defendant Reilly. They took from the latter's possession 25 ten-dollar bills which bore the same serial numbers as the bills given Schad by Sergeant McCain. The officers obtained Reilly's permission to put a recorder on his telephone. Sergeant Hallinen overheard Reilly's end of a conversation with appellant which ensued. A tape recording was made of the entire conversation, and it was stipulated that the transcription from that recording clearly reflects the conversation between

Reilly and appellant. Because of the vital importance of this conversation portions of it are repeated here:

"CHIEF: Hello, Pat. This is Dannie.

"PAT: Oh, yeah, Dannie.

"CHIEF: What's cooking?

"PAT: Well, you know the other night.

"CHIEF: Yeah.

"PAT: On this Dr. Chivers.

"CHIEF: Yeah.

"PAT: Well, I have got the money.

"CHIEF: Yeah, well, don't talk like that. Where in the hell are you?

"PAT: Oh, I am sorry.

"CHIEF: (Laughter)

"PAT: Whew!

"CHIEF: (More laughter)

"PAT: How it slipped out—I didn't realize.

" .    .    .    .    .    .    .    .    .

"PAT: Tonight you will see me?

"CHIEF: Yes, that will be all right, won't it?

"PAT: Yes, and can't I put it in an envelope then?

"CHIEF: Yes or anything. Any way you want it; will see you sometime down there this evening—okay.

" .    .    .    .    .    .    .    .

"CHIEF: Hey, is everything okay on this thing?

"PAT: Oh, fine, yeah.

"CHIEF: Yeah.

"PAT: Yeah, everything going okay; Roger got the money yesterday.

"CHIEF: Yeah.

"PAT: He got it yesterday, like it was made arrangements for. He wanted to know what to do with it so I told him I would take it.

"CHIEF: No repercussions, huh!

"PAT: No repercussions at all here.

"CHIEF: Well, I didn't want to talk to anybody but you, see.

"PAT: Yes, I know.

"CHIEF: Okay. Well, I will see you tonight sometime."

At approximately 5:30 p. m. on November 19 defendants Reilly and Schad were taken to the Dinnerhorn in custody and under surveillance where they went to work behind the bar. Prior to going there the $250 was again checked against the serial numbers and handed to Reilly in a blue envelope.

At approximately 12:30 a. m. appellant walked up to the bar and engaged in a conversation with Reilly. The latter reached into his pocket and placed the envelope on the bar. Appellant with his left hand, palm down, removed the envelope from Reilly's hand and placed it in his left trousers pocket. The deputy sheriffs followed appellant out of the restaurant and into the parking lot where they identified themselves and told appellant that they would like to have the money he had just received. Appellant reached into his left trousers pocket and removed an envelope. He stated, "I don't know what it is—someone just gave it to me," and dropped it on the ground. It was recovered. Appellant asserted in part, "Isn't there something we can do about this? I will get out of police work; I will resign; I will leave the area. I am thinking of my wife and my two children. . . . You know this is wrecking a twenty-year career of police work."

Appellant was transported to the Hall of Justice where a statement was taken from him, transcribed and subsequently entered into evidence. In this statement appellant said he had been chief of police of Covina for two years and four months and before that a lieutenant for a metropolitan police department, having worked in that capacity for 20 years prior to his retirement.

In his statement appellant asserted that Dr. Chivers had been arrested by Covina police officers and charged with drunk driving but the charge was based upon weak evidence. Appellant went to the jail and procured Dr. Chivers' release after the doctor signed a "probable cause" statement protecting the police officers.

Appellant further stated on the day following Dr. Chivers' release he had a phone conversation with defendant Reilly in which Reilly expressed a wish to show his appreciation for what appellant had done. Appellant said he dropped in at the Dinnerhorn late that evening; Reilly handed him an envelope saying, "This will explain everything" to which appellant replied, "Okay, see you later"; appellant walked to the parking lot where he was stopped by officers; he took the envelope out of his pocket and threw it to the ground because he thought it was a "set up or something" and he was unaware of what was in the envelope.

Appellant further asserted that there was no demand for any payment on the part of anyone and that the doctor had already been released before the incident of the envelope; that he had no idea there was $250 in the envelope; that he

had no object in accepting the envelope, as it was just something that "has probably been done a thousand times; that things were busy there, no time to talk to this bartender. . . . it seemed to me that the fellow was trying to explain his appreciation for what happened in this doctor deal, but I had no reason to believe that was it."

Appellant took the stand and testified in his own behalf and when cross-examined concerning the recorded telephone conversation between defendant Reilly and himself he asserted that "the conversation was, it sounded like a lot of double talk to me. I didn't know what he was talking about. . . . The only impression I got out of the call was that this fellow wanted to get in touch with me and he wanted to talk about the Chivers case and so forth but the main impression I had was that he wanted to get in touch with me. . . . so I told him I would see him later that night and have a drink with him." He denied recalling that Reilly had said anything to him in the recorded telephone conversation concerning getting the money.

█ Appellant contends on appeal that there was insufficient substantial evidence to sustain the verdict. However, from the summary of the evidence heretofore given it is quite apparent that there was substantial evidence from which the jury could conclude that a bribe was solicited from Dr. Cline; that a bribe was given; and that appellant and the two other defendants did conspire. Appellant does not challenge the fact that his two codefendants did commit the offenses, but he contends primarily that the evidence does not connect him with these offenses.

█ A criminal conspiracy is a corrupt agreement between two or more persons to commit an offense prohibited by statute accompanied by some overt act in furtherance of the agreement. (*People* v. *Frankfort,* 114 Cal.App.2d 680, 688 [251 P.2d 401].) █ In order to show a conspiracy it is not necessary that an express agreement be proved. (*People* v. *Kobey,* 105 Cal.App.2d 548, 562 [234 P.2d 251].) Substantial evidence is all that is required. (*People* v. *Andrews,* 165 Cal.App.2d 626, 634 [332 P.2d 408].) █ Such conspiracy may be inferred from the acts and the conduct of the defendants in mutually carrying out a common purpose in violation of the statute. (*People* v. *Stanley,* 162 Cal.App.2d 416, 419 [327 P.2d 973].) █ Once a conspiracy has been established only slight evidence is needed to connect appellant with

the conspiracy. (*People* v. *Serrano,* 180 Cal.App.2d 243, 249-250 [4 Cal.Rptr. 470].)

In the case at hand there is substantial evidence tying the appellant in with the conspiracy. The recorded telephone conversation clearly established his connection with it. His immediate reaction in seeking to rid himself of the envelope and his damaging statements when apprehended all were the actions of a party who realized his guilt.

Appellant argues that the evidence shows he knew nothing of the activities of Schad in contacting Dr. Chivers' friend, Dr. Cline, and that Dr. Chivers was shown to have been released before anyone agreed to pay a bribe. He contends that this evidence strongly supports an inference that the bartenders were acting for themselves and had no intention of telling him of their demands on Dr. Cline. These and other arguments all involve a reweighing of the evidence and it is fundamental that appellate courts must assume in support of the judgment the existence of every fact which the jury could reasonably have deduced from the evidence. (*People* v. *Sinshiemer,* 182 Cal.App.2d 103, 108 [5 Cal.Rptr. 740].)

The fact that these same facts could also be reasonably reconciled with the innocence of the defendant, assuming for the moment that they could, would not warrant a reversal. (*People* v. *Sinshiemer, supra,* at p. 108.)

Appellant asserts that the extrajudicial confessions made by Reilly and Schad in which they implicated appellant could well have prejudiced the jury against him despite the admonitions of the trial court. Appellant based his defense in part upon an attempt to make the jury believe that the two bartenders had solicited the bribe with every intention of keeping it for themselves; that they attempted to implicate him only after they saw what appeared to be police officers in plain clothes in the restaurant after McCain had given Schad the money.

These are all considerations which were fully presented and argued to the jury and it is to no avail to reargue them to this court. Suffice it to say that there was substantial evidence to sustain the verdict as to all defendants on all three counts.

The second principal contention by appellant on appeal is that the trial court erred when it failed to answer a question propounded by one of the jurors at a time when the jury returned to the courtroom during their deliberations

for the purpose of having certain testimony read. The judge framed the first question asked of him as follows:

"THE COURT: Your first question: Does paying an officer for a favor previously done constitute bribery?

"The only answer I can give to that is that bribery is defined in the instructions that I gave you to go up with you to the jury room. If what you find to be the facts fit the crime as defined, that is it.

"MRS. VERONICA DAVIS (Juror No. 8): Your Honor, we don't seem to agree on what bribery is. If an officer received money, say a week after he has done somebody a favor, is that bribery?

"THE COURT: Well, all I can tell you is that as a matter of law, the actual receipt does not actually constitute a bribery; however, as I told you, bribery as defined herein is something else if you find the facts that fit bribery, that is it.

"JUROR No. 8: Even in conspiracy or solicitation?

"THE COURT: Just let me get this instruction. I want to clarify this.

"You have got three counts here, and, one, coming to your second question, that is can there be bribery without solicitation and conspiracy. Now, I have told you there are three separate counts, and in this statement there are three separate, distinct charges and you are to decide each one of them separately.

"They are charged in Count 1, all three, with wilfully, unlawfully, corruptly, knowingly, and feloniously asking and agreeing to receive of and from Doctor Charles E. Cline a bribe, to-wit, the sum of $250.00, et cetera, for the purpose of influencing and so forth.

"Now that is the agreeing to receive, and that is the first crime they are charged with. This is a separate, distinct offense. It is not dependent upon whether or not you find them guilty of either or both of the others. It stands separate and alone, just as if you come in here and have three different trials, one on each of the charges.

"The second count is that they wilfully, unlawfully, and feloniously solicit another, to-wit, Dr. Charles E. Cline, to commit and join in the commission of the crime of bribery. Now that is the second count and it is just as independent of the others although they arise out of the same incident, it is still a separate, distinct offense, and, as I told you in my instructions, you decide each one independently of the others.

"Now, the third is the crime of conspiracy, which, in effect, is an agreement or partnership among the three to do certain unlawful acts which I have defined for you. You can find them guilty on any one or all or not guilty on any one or all. Neither is dependent upon the other and does that answer your question? They are separate and distinct as though you had a trial for one, a trial for two or a trial for three, and does that straighten it out for you?

"All right, now do you want the tape played—all right, proceed."

The judge's answer that "the actual receipt does not actually constitute a bribery" was a correct statement of the law. He then quite properly reviewed the fact that each count was a separate charge and should be separately decided. We find no error here. It must also be remembered that the jurors had a set of the instructions with them in the jury room. We must assume that the instructions given by the court were entirely adequate and proper since if appellant had desired to complain of them in any respect it would have been necessary for him to make them a part of the record on appeal, which was not done. (*People* v. *Fong*, 126 Cal. App.2d 118, 121 [271 P.2d 551].)

Judgment is affirmed.

Jefferson, J., and Balthis, J., concurred.

A petition for a rehearing was denied May 29, 1962, and appellant's petition for a hearing by the Supreme Court was denied July 3, 1962.