[Crim. No. 11448. Second Dist., Div. Four. Dec. 26, 1967.]

THE PEOPLE, Plaintiff and Respondent, v. EMMETT CANARD et al., Defendants and Appellants.

Russell E. Parsons, Harry E. Weiss, Forno & Lewis and Joseph T. Forno for Defendants and Appellants.

Thomas C. Lynch, Attorney General, William E. James Assistant Attorney General, and Howard J. Bechefsky, Deputy Attorney General, for Plaintiff and Respondent.

JEFFERSON, J.—In an indictment returned by the grand jury, Peter Stafford and Henry De Maddalena, Los Angeles police officers, together with Emmett Canard, Cyril Myers, George Miller and Maury Adler, were charged with conspiracy to offer and give bribes to executive officers of the State of California (Pen. Code, § 67), to ask for and receive bribes for officers, employees and appointees of the City of Los Angeles (Pen. Code, § 68), to engage in bookmaking (Pen. Code, § 337a), and to obstruct justice and the due administration of the laws pertaining to bookmaking and bribery (Pen. Code, § 182 subd. 5). Seven overt acts were charged, each alleged to have occurred during the period from February 15, 1964, through March 20, 1964. A jury found each defendant guilty, and returned a special verdict finding that the objects of the conspiracy were those charged in the indictment. Stafford, Canard, Myers and Miller appeal. Stafford's appeal is from the judgment sentencing him to state prison. The other defendants appeal from the order granting them probation (which is treated as a final judgment under Penal Code, section 1237).

Generally speaking, defendants urge the same basic contentions. At the outset, to answer their challenge that the evidence is insufficient, we present a summary of the pertinent facts (viewing them as we must in the light most favorable to the People).

Defendants Stafford and De Maddalena were members of the Los Angeles Police Department. Stafford was a supervising sergeant assigned to the bookmaking detail of the Central Vice Division. He was an acknowledged expert in bookmaking law enforcement. Late in 1963, upon the recommendation of Stafford, Officer De Maddalena was transferred to the Central Vice bookmaking detail to work under Stafford. On February 1, 1964, De Maddalena and Officer Joseph Gunn were assigned as partners to work the West Los Angeles area.

On February 15, Gunn and De Maddalena were on an assignment at the Kismet Bar, when De Maddalena stated, "Here's some money for you." He handed Gunn a $50 bill and told him "It's for your New York vacation!" Gunn asked what he had to do for the money and De Maddalena said, "You won't have to do anything. You won't know anything about anything. All you have to do is get your money from me. This concerns something that is out of our district and we can go ahead and make our arrests every month and it won't be any concern to us."

After leaving De Maddalena, Gunn went directly to Lieutenant Wilson, the acting division commander, and told him what had transpired. At a meeting held on February 17, with Captain Nelson (the administrative vice-commander) and Captain Mills (the internal affairs commander) both in attendance, Gunn was instructed to go along with De Maddalena in order to find out all the officers and criminal elements involved. He was to report what he found out to Captain Mills.

The next time Gunn saw De Maddalena was on February 18. De Maddalena told him he would be paid $200 once a month. On February 20, outside the Clown Town Bar, De Maddalena, then in a state of intoxication, showed Gunn the last page of his personal notebook. It contained letters and numerals. He told Gunn it was a code and represented the phone numbers for 17 "front and back offices" for Cyril Myers, the biggest sports bookmaker in Los Angeles.

"Front offices" and "back offices" are terms used to describe places where illegal bets are received and recorded by bookmakers. A front office is staffed by a clerk who takes bets

phoned in by bettors and temporarily records them on objects which are quickly destructible. The back office is the place where the bets are thereafter permanently recorded, usually on pads called betting markers. Periodically, the back office clerk telephones the front office clerk, and the latter relays the bets received and then destroys his record.

After showing Gunn his notebook, De Maddalena stated that Gunn's job would be to periodically check "the telephone board" at Administrative Vice.

When an Administrative Vice officer wants the address for a telephone number of a suspected bookmaking establishment, he writes the number on a clipboard referred to as "the telephone board." It is kept by an employee in the administrative section of the department. By calling the intelligence division (who would in turn contact the telephone company), the employee secures the address of the telephone for the investigating officer.

De Maddalena told Gunn that he should bring the telephone numbers he got off the telephone board to him to check against the numbers in his notebook. If they matched one of the numbers of Cyril Myers, he would warn him about the impending investigation.

On February 22, De Maddalena told Gunn that the payoff would be on the 15th of the month. He stated, on February 26, that Sergeant Stafford was part of the deal. The next day he said that Canard, of the Crown Hill organization at Third and Lucas Streets, and some other bookmakers were also involved.

On February 27, De Maddalena said he had to attend a meeting in Pasadena with Myers and that Stafford would probably be there. Two days later he told Gunn about having gone to the meeting. He said that Stafford, Myers and Maury Adler, who managed Myer's dress shop at Wilshire and Oxford, were at the meeting; Myers told them that he had changed his phone numbers; Myers also agreed to pay them $200 a month. De Maddalena further stated that he had mentioned Gunn's name at the meeting.

On March 4 De Maddalena told Gunn that five bookmakers, including Myers and Canard, were paying them off; Pete Stafford had only about four months to go in Central Vice; when he finished his tour of duty, he and Gunn would be the bosses of the operation; Stafford was picking up all the money and making all the payoffs; because Stafford had numerous

ways "to cut the pot," he couldn't afford to give them more than $200 each; Stafford himself cleared about $700 or $800 a month.

On the same date, De Maddalena instructed Gunn to copy down certain telephone numbers. He gave Gunn 16 numbers. Some, he said to put under Crown Hill, including DU 9-0888. Some, he told Gunn to put under Cyril Myers name, including a back office number, PL 4-2261 and a front office number, RE 3-4745. Madison 6-4572 was to be put under the name George Miller. Gunn was also given Myers' and Stafford's home numbers and Adler's numbers at Myers' dress shop. De Maddalena said that, if any of the numbers came up and he was not around, Gunn was to call "Cy, Maury or Pete" and warn them. To identify himself when he called, he was instructed to say "this is Mr. Harris calling."

On March 9, De Maddalena told Gunn he was going to see George Miller; he would get some money from Miller for protecting a Barboudi game Miller was going to open up. On March 11, Gunn was told by De Maddalena that he planned to see Stafford on Sunday to pick up their money.

Gunn reported everything De Maddalena had told him to his superiors. On March 12, following a plan set up by them, Gunn went at 11:15 a.m. to Administrative Vice and picked up two phone numbers from Lt. Wilson. They were numbers for a back office and a front office listed to Cyril Myers. The front office number was RE 3-4745. He immediately went down to the Internal Affairs Division and from there dialed Pete Stafford's telephone extension. The following conversation took place:

"Q Pete?

A Yeah.

Q This is Joe Gunn.

A Yeah.

Q Can you talk?

A Yeah.

Q All right. Look Hank's off today.

A Yeah.

Q And he sent me out on that stake-out this morning out in Beverly Hills on Oscar Stewart.

A Yeah.

Q And I just got back in the office a little while ago and Wilson is briefing Safford in there.

A Yeah.

Q And a couple other squads and they're going out to hit a back and a front right now; they're gone.

A Yeah.

Q They just left the office.

A You don't know who it is or nothing?

Q Yeah, I got the numbers. And it matches. The ones we got for Cy at the book.

A Yeah.

Q Hank gave me. Do you want them?

A The one for who?

Q For Cy.

A Yeah. Okay.

"Q All right.

A Okay. Fine. That's enough. Okay.

Q Do you want the front?

A Yeah, give me the front.

Q Okay, the front was REpublic —

A Yeah.

Q —34745.

A Yeah, okay, fine.

Q Okay.

A Thank you.

Q You'll take care of it, then?

A Thank you. Yeah.''

At 11:21 a.m. Stafford was observed leaving the Central Vice office. He went to the lobby of the police building and entered a public telephone booth.

On the morning of March 12 Sergeant Safford (not to be confused with defendant Stafford) had been instructed by Lt. Wilson to place Apartment 9 at 12036 South Vermont Avenue under observation. Safford had received the phone number PL 4-2261 in connection with that address. At 11:45 a.m. he observed a man carrying a bundle leave the apartment.

The man was Wayne Galligan. He was operating a back office from that location. He had received a telephone call telling him to leave.

On March 13, De Maddalena drove with Gunn to Myers' dress shop. He told Gunn he was going inside to get Adler's new back office number. When he returned to the car, he stated that Adler had said they were not going to have a permanent back office number again until they found out where the leak was that resulted in the back office number getting out the day before. He said that Galligan, the clerk at that back office, would temporarily óperate a ròtating back office, moving from location to location each day.

In February and March, Canard and a woman known as

Michelle Parks were staying in Apartment 5, at 250 South Reno Street. The telephone number of their apartment was DU 9-0888. At 1 a.m. on March 13, pursuant to instructions from Lt. Wilson, Sergeant Safford went to the Reno Street apartment driving an undercover police car. It had been assigned to him since August 1963. The license number was NZK002. As he entered the hallway of the apartment building, he observed Michelle Parks. She approached the door of Apartment 5, turned and looked at him, and then entered the apartment. Safford left the building, circled the block on foot and then returned to his car. After driving a few blocks, he noticed a vehicle without lights following him. When it pulled over and parked, he turned and drove past it. Michelle Parks was standing near the car.

Later that same morning defendant Stafford made the following telephone call from the office of Central Vice:

"FEMALE VOICE: Motor vehicles.

MALE VOICE (Stafford): Nora Zebra King 002.

FEMALE VOICE: Nora Zebra King 002.

MALE VOICE: Uh-huh.

FEMALE VOICE: Who is calling, please?

MALE VOICE: Central Vice.

FEMALE VOICE: One moment.

MALE VOICE: Hey Mortell. Where's he at? Tell him to come back. We've got a lewd phone call deal here. Where's Crantford. Is Crantford in Court?

FEMALE VOICE: Nora Zebra King 002.

MALE VOICE: Yeah.

FEMALE VOICE: I'm sorry. We've no record.

MALE VOICE: Thank you.

FEMALE VOICE: You're welcome."

Shortly thereafter Stafford placed another call, also from the same location. He talked with someone in the vehicle dispatcher's office:

"FIRST MALE VOICE: Dispatcher's office, Ramon.

SECOND MALE VOICE: Yeah, Ramon. This is Stafford, Central Vice.

FIRST MALE VOICE: Uh-huh.

SECOND MALE VOICE: Say, I think I left a—first of all, I think this is the car. Do you have a car that is Nora Zebra King 002, a green, blue Ford? I think that was the license number, but I can't remember.

FIRST MALE VOICE: I don't know but—was it a two-door and light green Ford, '59?

SECOND MALE VOICE: No. It was a blue—kind of a blue one. '60 Ford, I think it was.

FIRST MALE VOICE: Did you come in today?

SECOND MALE VOICE: No, the other day I had it out.

FIRST MALE VOICE: Well, anyway, what are you looking for?

SECOND MALE VOICE: I was looking for a notebook I had in there, that's all.

FIRST MALE VOICE: Because I'm looking right here in the drawer and there's a brown zippered notebook.

SECOND MALE VOICE: No, that's not it.

FIRST MALE VOICE: And let's see what else is in here.

SECOND MALE VOICE: O.K. Maybe it's not there then.

FIRST MALE VOICE: There's a little booklet.

SECOND MALE VOICE: You don't have the cars according to license number anyhow, do you?

FIRST MALE VOICE: No, not by license number.

SECOND MALE VOICE: O.K. Thank you.

FIRST MALE VOICE: But most cars are in here today, so——

SECOND MALE VOICE: Yeah, well, I'll take a look after a while.

FIRST MALE VOICE: O.K."

On March 15, Stafford and De Maddalena were observed conversing at a car wash in De Maddalena's car. The next day De Maddalena gave Gunn two $100 bills.

Pursuant to instructions from their superiors, on March 20 at 8:30 a.m., Lt. Hill, Sergeant Judd and two other officers, approached defendant Stafford after he dropped his son off at school. He was driving a police vehicle. He was told he was assigned to Lt. Hill for the day; that he was the subject of an investigation. They picked up his notebooks, which were lying on the seat of the car, and drove him to a motel where he was searched and then held incommunicado for the next few hours.

At 10 a.m. Lt. Wilson sent 75 policemen out to the vicinity of the suspected front and back offices, the addresses of which their investigation had uncovered. Those sent to the back offices were instructed that, after receiving a radio signal at about 11:30 a.m., they were to arrest anyone who left the locations. The officers going to the front offices were told to attempt to "stiff-in" (to place) a wager over the telephone.

The officers arrested Canard as he left Apartment 5 at the Reno Street apartment building. They found bookmaking

"owe sheets," marker pads and two adding machines in the apartment. The phone number there—DU 9-0888—was in Stafford's notebook under Canard's name. It was also in De Maddalena's notebook.

In all, the investigation undertaken that day revealed evidence of bookmaking at 10 locations the telephone numbers of which both De Maddalena and Stafford had in their notebooks. At one front office the officers were able to "stiff-in" a bet.

While the field investigation of March 20 was still in progress, Captain Mills instructed Officer Gunn to call Myers and Adler and, using the Harris code, indicate to them their back office would be hit. At 11:30 a.m. Gunn called Adler at Cyril's dress shop. The following conversation took place:

"FEMALE VOICE: Good morning, Cyril's.

Q May I please speak to Mr. Adler?

FEMALE VOICE: Mr. Adler? Hold the line, please.

A Hello.

Q Mr. Adler?

A Yes.

Q This is Mr. Harris calling.

A Yes sir.

Q Look, I can't get ahold of Pete.

A Yes.

Q And I can't get ahold of Cy, the line's busy out at the shop.

A Yes.

Q And a couple of guys just left the office and they're talking about hitting a back.

A A who?

Q They're talking about hitting a back office.

A Yes.

Q And the only name I got was Galligan. They're talking about a guy named Galligan. That's supposed to be a clerk on it.

A Yes.

Q So I tried to get ahold of Pete. I don't know where the hell he is. He's out in the field somewhere. And Hank, he's in court today. I don't know where the hell he is. So will you take care of it?

A Yes.

Q Okay.

A Okay."

Gunn then called Cyril Myers and had this conversation:

"Q May I speak to Mr. Myers, please?

FEMALE VOICE: One second.

A Hello.

Q Mr. Myers?

A Yes.

Q This is Mr. Harris calling.

A Yes, Mr. Harris.

Q Look, I can't get ahold of Maury at the shop.

A Yeah.

Q The line's busy there and Pete's out in court.

A Yeah.

Q And a team just left the office just now.

A Yeah.

Q And they were talking about hitting a back office, and they mentioned the name Galligan. Now, I notice that is the guy from the last time, right?

A Yeah.

Q All right. So you take care of everything?

A Yeah. He told me he was taking a hike and he was gone all day, and I told him not to go near the place.

Q What did he say?

A He spotted someone following him this morning.

Q He spotted someone following him this morning?

A Yeah. I told him not to go near the place.

Q Why, is he at it now?

A Huh?

Q Is he at the place now?

A No, no.

Q There's nobody in the back now?

A I don't think so, no, sir. I'll try right away. I don't even know the number, but I'll try it.

Q All right. Well, look, if you're held up, do you want me to give it a try?

A I don't even know the number.

Q Oh, well, you know where it is?

A No.

Q Jesus, that's—how we going to get ahold of him?

A I don't know. Maury's not at the office, huh?

Q The line's busy, it's been tied up. I can't get ahold of Maury.

A Let me see if I can reach him right now.

Q All right. You're going to try to reach Maury right now?

A I'll keep on it right now.

Q You want me to call you right back here?

A Could you, please?

Q Yeah, I'll call you back in a few minutes, Okay, Cy?

A You bet.

Q Okay. Goodbye.''

Shortly thereafter Gunn again called Myers:

''FEMALE VOICE: Hello.

Q Mr. Myers, please.

FEMALE VOICE: One second.

A Hello.

Q This is Mr. Harris.

A Yeah, Mr. Harris, I reached him. He said he'd been trying to get——he got messages to all the fronts.

Q He got messages to all the fronts?

A Yeah.

Q All right.

A And I told him a——left messages . . . with him, but he's not in the back.

A No.

''Q Well, good, Goddamn, see, because, you know, I haven't seen Hank today, you know, De Maddalena?

A Yeah.

Q Because he's been in court. And I came right into the office today, so I didn't know whether he had this or not.

A No, he——

Q You know, whether he had called you or not.

A But he called me this morning. He said he knew he was getting tailed. So I says, 'Well, don't go near the place. Just stay away, don't do nothing. Put a line in if you can; if you can't, forget it.'

Q Well, how the hell did Maury know?

A Did you call Maury?

Q No, I haven't called him.

A Maury said he talked to you.

Q Not to me. I've been trying to get him and the damn phone's been busy down there.

A He told me he talked to you 20 minutes ago.

Q Not me, no, sir.

A What the hell is this.

Q Well, that's what I want to know. See, I haven't seen

De Maddalena and wanted to know maybe he called or something.

A He wouldn't use the Harris, would he?

Q Who, De Maddalena?

A Yeah.

Q Well, hell, I think so, wouldn't he? Well, do you think—do you think one of the other boys called?

A I wouldn't know who.

Q Well, I know it's not Pete, because I can't get ahold of Pete. And I thought it was De Maddalena; either him or Shoopman or Burke, or one of those, you know.

A Burke? He was trying to hang me.

Q Burke was trying to hang you?

A I imagine.

Q Why is that?

A Well, he doesn't like me, I don't think, very well.

Q Well, do you think Shoopman could have called Maury?

A I don't know him.

Q Well, shit, I don't—

A I don't know.

Q Well, who else has this—who else has the bit?

A I only know this Pat and this Harris. The only people I ever knew.

Q Just Hank and Pete, and that's it?

A And only Hank.

Q Well, Stafford, I mean.

A No, I don't know him.

Q Well, Goddamn. I wonder who called Maury. Well, either way, it turned out all right, so—

A I hope so.

Q —we'll worry about that later. Well, all right. As long as you got ahold of him. Cy, everything's o.k. then.

A All right, boy.

Q O.K. I'll see you, huh?

A All right.

Q Goodbye.''

De Maddalena testified that, shortly after he transferred to Central Vice, Stafford gave him $100, saying ''this is from some people that are taking care of us.'' Tommy Canard's name was mentioned. When he went to Administrative Vice in January 1964, Stafford told him he would be paid for protecting Canard, Cyril Myers and others, by watching the Administrative Vice telephone board. Stafford gave him the numbers to be protected and he put them on the last page of

his notebook. He received $200 from Stafford for performing this service. The $50 he gave to Gunn was given to him by Stafford with specific instructions to give it to Gunn. In February 1964, he met with Stafford, Myers and Adler at the Westward Ho Restaurant in Pasadena. At this meeting they agreed to use ''Mr. Harris'' as a code name. Gunn was given the $200 for ''going along with the play.'' He received the money from Stafford at an Arcadia car wash. In February or March, Stafford told him that George Miller was opening a gambling operation in the downtown area and would also pay for information.

One of the front offices hit by the police on March 20 was the Nelson Jewelry Company, located in room 1106 at 215 West Fifth Street. Patricia Locricchio was taking and recording bets from that location. Their phone number appeared in Stafford's and De Maddalena's books. In February and March the rent for room 1106 was paid by a check drawn on the Guardian Bank. Ann Lieber, an employee of the landlord of room 1106, received the check. She put the number 1106 in one corner and deposited it. On April 20 defendant Miller went to the Guardian Bank and asked to see the check, giving the date, drawer and its amount. He said he wanted to see it for a friend named Don. A secretary handed him the check and then turned to take a telephone call. When she came back to Miller, she saw that the check had been written over and the number 1106 had been erased. Miller said ''the handwriting wouldn't be the same on this one as it was on this—on this now as it was in its original form.''

Stafford testified, denying any involvement in the conspiracy alleged. As part of his job, it was his practice to keep the phone numbers of suspected bookmakers in his notebook. Many of the numbers supplied to him by informers. He and De Maddalena met Adler and Myers simply by chance at the Westward Ho Restaurant in February 1964, and were invited to dinner by them. They did not discuss bookmaking. He was acquainted with Myers before that time and knew he was a gambler. On March 16, when he was at the car wash, he and De Maddalena were discussing De Maddalena's family and health problems. He did not give De Maddalena any money nor did he receive any money from any of the other codefendants.

Stafford remembered receiving the telephone call from Gunn on March 12. At the time he thought Gunn wanted to get hold of De Maddalena but that he was double talking

because he was talking in front of a superior. He thought the phone number mentioned by Gunn was where Gunn thought De Maddalena might be reached. He went to a phone booth to call the Lake Club which De Maddalena frequented. He used the public phone because personal calls are not permitted from the office. He talked with Ralph Dark who said De Maddalena was not there.

Stafford further testified that on March 13 he found a mug book with a note attached, "Possibly came out of NZK 002, a 1962 blue Ford." He did not know where it belonged so he tried Motor Vehicles. When he later called the motor pool to inquire about a car he had used a few days earlier, he gave the above license number by mistake.

In his testimony Stafford stated that he knew Miller. He was reputed to be a gambler. He sometimes got information from him. Miller had once published "Post and Paddock" which contained tips on the races. He also knew Canard, who was a bartender and small time gambler. Canard also gave him information.

Of the notation "Phone Cy" found in his notebook, Stafford testified that the Cy referred to an informer named Cyzeck. His notebook entry "make meet with Cy, Maury, Hank" referred to Gordon Jones (the Cy being G. J.), Maury Rissman and Officer Hank Weldon.

Adler testified, acknowledging that he and Myers had dinner at the Westward Ho with Stafford and De Maddalena. According to Adler they met by chance and did not discuss gambling. He knew his employer Myers was a gambler. Concerning the March 20th telephone call he had received, Adler stated that he did not understand what the caller was talking about, "so he just listened" attempting to recognize the voice. There were two offices over the dress shop. One was referred to as a back office. It had no connection however with bookmaking. He thought the caller might be a robber. He had been a robbery victim twice in the past.

In his testimony Myers stated that, when he received the call on March 20, he was suspicious and just tried to keep the person talking.

Miller testified that he knew plenty of bookmakers. He gave Stafford the numbers of several of them to keep him from bothering the customers at his fruit company. He had no connection with room 1106 at 215 West 5th Street. He had gone to the Guardian Bank on April 20 to do a favor for a friend named Dominic, a reputed bookmaker, who told him he

bought a money order there and wanted it back. When the woman at the bank refused to let him have it, he did a "foolish thing," writing over it. He did not, however, erase the number "1106" on the check.

Canard did not testify.

█ The evidence above summarized is amply sufficient to support the finding of the existence of the conspiracy charged. █ A conspiracy may be established by circumstantial evidence. (*People* v. *Steccone*, 36 Cal.2d 234, 237-238 [223 P.2d 17]; *People* v. *Salani*, 218 Cal.App.2d 835, 839 [32 Cal. Rptr. 592].) It is not necessary for the People to show that the defendants actually met and agreed together to perform the unlawful acts. (*People* v. *Steccone, supra,* p. 238.) From their acts and conduct in mutually carrying out the common illegal purpose, the existence of the conspiracy may be inferred. (*People* v. *Danielson*, 203 Cal.App.2d 498, 505 [21 Cal.Rptr. 469].) █ The circumstances here clearly indicate the existence of and the carrying out of a scheme to give protection to certain bookmakers through the bribery of police officers. The involvement of each appealing defendant in the conspiracy was plainly shown.

█ Defendants point out that the testimony of De Maddalena was that of an accomplice which required corroboration. (Pen. Code, § 1111.) █ However, the corroborative evidence necessary to connect individual defendants to the crime charged need only be slight; and may be evidence that, standing alone, would be entitled to but little consideration. (*People* v. *Wayne*, 41 Cal.2d 814, 822 [264 P.2d 547]; *People* v. *Hensling*, 205 Cal.App.2d 34, 42 [22 Cal.Rptr. 702].) █ De Maddalena's testimony that Stafford was a part of the conspiracy, was corroborated by the evidence of the clearly incriminating March 12 telephone conversation between Stafford and Gunn. The testimony of De Maddalena connecting Canard was corroborated by the finding of his phone number in Stafford's notebook and by the fact his residence contained evidence of bookmaking. Miller's defacing of the rent check for the front office located in room 1106, and the fact his phone number was also in Stafford's book, corroborated De Maddalena's testimony regarding him. Finally, the testimony of De Maddalena concerning Myers was corroborated by the latter's admissions in the March 20 telephone conversation with Gunn. █ Gunn's testimony did not require corroboration. A feigned accomplice is not an accomplice whose testimony must be corroborated. (*People* v. *Hensling, supra,* 205 Cal.App.2d 34, 40.)

■ Defendants complain that the trial court unduly restricted the testimony of an expert witness called by the defense. A psychiatrist was permitted to testify that he examined De Maddalena and concluded that alcoholism had impaired his memory. The court would not, however, permit the witness to be asked whether, in his opinion, De Maddalena's testimony could be believed. The court's ruling was proper. The credibility of the witness was a question solely for the jury. (Code Civ. Proc. § 2061 [now Evid. Code, § 312, subd. (b)].)

■ Defendants contend that Stafford's and Canard's notebooks were the fruits of illegal searches and seizures and therefore were improperly admitted.

Stafford's notebooks were seized by his fellow officers when he was taken into custody on March 20th. They were observed lying on the seat of his assigned police vehicle. From what was revealed by the investigation of Stafford and his suspected coconspirators at the time he was picked up (see the above summary of the facts), there was clearly reasonable or probable cause for his arrest for the conspiracy offense with which he was subsequently charged. The notebooks were properly seized as evidence of the crime. (*People* v. *Thayer,* 63 Cal.2d 635 [47 Cal.Rptr. 780, 408 P.2d 108].)

Canard was arrested during the March 20th field investigation as he was leaving his Reno Street apartment. The investigating officers had been advised to arrest anyone emerging from that apartment after they received the appointed 11:30 a.m. radio signal. At the time of the arrest, Canard and the apartment were searched. The search of the apartment revealed evidence of bookmaking. The notebook in question was found in Canard's pocket. As was the case with Stafford, the information which had been obtained prior to March 20 indicated circumstances sufficient to support the conclusion that probable cause existed for Canard's arrest. The search and the seizure of the notebook were a reasonable incident to that arrest.

■ During the progress of the trial, defendants moved for a mistrial on the ground that unfavorable publicity in the local press and on television news prejudiced their chances for a fair trial. The court denied defense requests to poll the jury to determine whether they had read or heard the news reports, and denied their motions for a mistrial. Defendants assign this as error.

The publicity referred to consisted mostly of substantially

accurate reporting by the news media during the trial of the evidence as it was presented. There were two notable exceptions: On April 20, 1965, the prosecution's star witness, Officer Gunn, testified that in a conversation with De Maddalena which concerned the latter's plan to take over the operation when Stafford left Central Vice, he had asked De Maddalena if he was afraid of Stafford. De Maddalena had indicated he thought he could handle Stafford, although he was known as a "mean guy" who had "access to muscle" and who had set up several individuals in the past for a "working over"; that one of these individuals, a bookmaker named Lipowitz, had been set up by Stafford "for a working over with a baseball bat." This testimony was elicited without objection. After it had been received, a motion to strike was denied. However, later in the trial—on May 3, 1965—the court granted defense motions to strike it.

On April 23d the Los Angeles Herald-Examiner printed a story concerning the statement that Stafford had Lipowitz beaten up with a baseball bat. In the story, details of that beating and another one Lipowitz allegedly received were reported. The details were never brought out at the trial.

On the 5 p.m. and 11 p.m. KABC-TV Baxter Ward news programs of the same date, Mrs. Lipowitz was interviewed. She was questioned concerning her husband's having been "worked over." She stated that she had gone to the trial to see Stafford, because she "wanted to see what a man looked like, an officer of the law, that could do such a thing as that." She further stated that putting Stafford in prison for the rest of his life could not adequately punish him for what he had done to her husband; that the testimony of his fellow officers indicated Stafford had had her husband beaten up.

Throughout the trial the court repeatedly, and in clear and unequivocal language, admonished the jurors that they were not to form any opinion on the case until it was submitted to them; that they were not to read any reports of the case in the newspapers, or to listen to or watch any reports of it on radio or TV. In its formal instructions, the court told the jurors that in deciding the case they were to be governed solely by the evidence introduced at the trial and the law as stated by the court.

The trial judge, in denying the motions for mistrial and to poll the jury concerning the news reports, concluded that the publicity was not conceivably prejudicial; that he was satisfied with the integrity and intelligence of the jurors and had to assume they abided by his repeated admonitions; that he

would not have the jury polled because he neither wished to arouse their curiosity nor to embarrass them.

Absolutely no evidence was presented that any pretrial publicity could have affected the selection of an impartial jury. This case bears no resemblance to *Sheppard* v. *Maxwell*, 384 U.S. 333 [16 L.Ed.2d 600, 86 S.Ct. 1507], relied on by defendants, where, during the six or seven months preceding the trial, there was "a barrage" of newspaper headlines, articles and other news reporting slanted against defendant and creating a "wave of public passion" against him.

Neither was there any evidence here of prosecutorial misconduct, or indicating any laxity by the trial judge or defense counsel in the performance of their respective duties. Presumably, the jury followed the court's instructions, and heeded the admonitions not to look at news reports of the case. (See *People* v. *Gomez*, 41 Cal.2d 150, 161-162 [258 P.2d 825].) Under the circumstances we cannot say the trial judge erred in concluding defendants were in no way prejudiced. Nor can we say the judge abused his discretion in not permitting a polling of the jury on the question.

■ Defendants complain about the use at the trial of recorded conversations secured by the police through the monitoring of police department telephones. In particular, Stafford contends that the tape recording and transcript of his March 12 telephone conversation with Officer Gunn, and of his March 13 conversations with the police dispatcher and the Department of Motor Vehicles, were inadmissible because the monitoring violated both state and federal law.

When word reached the chief of police that an investigation had uncovered evidence that members of Central Vice were involved in a criminal conspiracy and were utilizing Central Vice telephones for their criminal activities, he ordered telephone extensions installed in the Internal Affairs Division in order to monitor calls from the city telephones in Central Vice. The telephones involved went through the city hall switchboard. They were maintained by the city exclusively for the conducting of police business. The use of them was at all times subject to the orders of the chief of police. Members of the department, including Stafford, were aware how the phones were to be used. Private telephones were located in Central Vice which employees could use for personal matters.

The monitoring of the calls was not illegal. State and federal law prohibits only the "unauthorized" interception of

464

telephone communications. (47 U.S.C. § 605;[1] Pen. Code, § 640.) The state statute forbidding eavesdropping or recording conversations (Pen. Code, § 653j) applies only to ''confidential'' communications, which it defines (in subd. (c)) as including ''any communication carried on in such circumstances as may reasonably indicate that the parties to such communication desire it to be confined to such parties,'' but excluding the communication made under circumstances ''in which the parties to the communication may reasonably expect that the communications may be overheard or recorded.''

As indicated above, the telephones monitored in this case were city telephones used only for police business. Clearly, the chief of police, as the person supervising and controlling the use of the phones, was a person authorized to monitor them. Any call properly made on those telephones was the business of the chief of police, and hence not confidential as to him or those authorized by him to hear it. It is common knowledge that special security precautions must be taken in police departments; those using the lines could reasonably expect that it could take the form of monitoring calls.

The recording and use of the telephone conversations between Officer Gunn and several of the defendants (including the March 12 conversation with Stafford) would not have been unlawful even if made from a private telephone. As one of the participants to the conversations, Gunn's consent to the recording of the calls was all that was necessary. The laws on eavesdropping and the recording of telephone communications do not apply where one of the parties to the conversation consents to or directs its overhearing or recording. (*People* v. *Fontaine,* 237 Cal.App.2d 320, 331 [46 Cal.Rptr. 855]; *People* v. *McShann,* 177 Cal.App.2d 195, 200 [2 Cal. Rptr. 71].)

Defendants predicate error on the trial court's denial of their request to introduce evidence concerning the ultimate dispositions of the various cases in which arrests were made for bookmaking during the March 20th raids. The court correctly ruled against allowing in such evidence. The results of the investigation were admitted to show the nature of the places the telephone numbers of which Stafford and De

---

[1]Section 605 of the Federal Communications Act provides a rule of evidence for federal courts. It does not apply to proceedings in state courts. (*Schwartz* v. *Texas,* 344 U.S. 199 [97 L.Ed. 231, 73 S.Ct. 232]; *People* v. *Sica,* 112 Cal.App.2d 574, 585-586 [247 P.2d 72]. [Cert. den. 346 U.S. 831 [98 L.Ed. 354, 74 S.Ct. 36]].)

Maddalena had in their notebooks. Whether the occupants of those places were subsequently tried and convicted of bookmaking (or were acquitted, or had their cases dismissed), depended on such extraneous factors as the technical rules of evidence or whether guilt was proven beyond a reasonable doubt, matters having no relevancy to the issues of this case.

 Defendants suggest (now for the first time) that the jury should have been required to make individual findings as to the guilt of each of them of each charged object of the conspiracy. They argue that the possibility existed the jury arrived at inconsistent verdicts. No such result could have occurred. The jury was instructed: "In order to find the defendants, or *any of them* guilty, you must unanimously find that *such defendant* or defendants unlawfully conspired to violate Section 67 P.C., or unanimously find that *such defendant* or defendants unlawfully conspired to violate Section 68 P.C., or unanimously find that *such defendant* or defendants unlawfully conspired to violate Section 337a P.C., or unanimously find that *such defendant* or defendants unlawfully conspired to violate Section 182, subdivision 5 P.C." [Italics added.] The jury found defendants guilty as charged and that the objects of the conspiracy were those charged in the indictment. The jury thus found each defendant had conspired to effect each of the alleged objects of the conspiracy.

 The prosecution, in its cross-examination of Stafford, was permitted to refer on occasion to his testimony given before the grand jury. The evidence establishes that defendant was told before he appeared before the grand jury, pursuant to subpoena, that if he refused to testify by invoking the Fifth Amendment, it meant dismissal from the force. Defendant testified, on redirect examination, that he knew, if he refused to testify, he would be fired. When the prosecutor sought to impeach him through the use of his grand jury testimony, the defense objected that the testimony was involuntary, being the product of coercion.

In *Garrity* v. *New Jersey* (1967) 385 U.S. 493 [17 L.Ed.2d 562, 87 S.Ct. 616], decided during the pendency of this appeal, the Supreme Court held that (at p. 500 [17 L.Ed.2d at p. 567]), ". . . the protection of the individual under the Fourteenth Amendment against coerced confessions prohibits use in subsequent criminal proceedings of confessions obtained under threat of removal from office, and that it extends to all, whether they are policemen or other members of our body politic." The defendants in *Garrity* were police

officers who, before being questioned about an investigation concerning the fixing of traffic tickets, were told that anything they said could be used against them in state criminal proceedings; that they had the privilege to refuse to answer if the disclosure would tend to incriminate them; but that if they did refuse to answer they would be subject to being removed from office.

The same principles which operate to exclude involuntary confessions of an accused, also require exclusion of involuntary admissions where sought to be used as affirmative evidence of guilt. (*People* v. *Atchley*, 53 Cal.2d 160, 169-170 [346 P.2d 764].) It is further established that an accused's involuntary confessions may not be used to impeach him. (*People* v. *Underwood*, 61 Cal.2d 113, 120-121 [37 Cal.Rptr. 313, 389 P.2d 937].) This being so, the court in *Underwood* concluded (at pp. 120-121), ". . . a similar rule should operate to exclude involuntary *admissions* when they are offered for that purpose. . . . [Citations.]" Any prior inconsistent statement of the accused relative to the offense charged, constitutes an admission within the meaning of the principles regarding admissibility of involuntary statements, where used to impeach his credibility. (*People* v. *Atchley, supra,* 53 Cal.2d 160, 170; *People* v. *Underwood, supra,* 61 Cal.2d 113, 121-122.)

The prosecution sought in the following instances to impeach Stafford using his grand jury testimony:

Stafford testified that on March 13th he found two notebooks in the office while he was cleaning a file cabinet. One of the books had the note attached "Possibly came out of NZK 002, a 1962 blue Ford." He wrote the number in his notebook and called the Department of Motor Vehicles to attempt to locate where the notebooks belonged. He had lost a notebook himself and the next day he called the motor pool and inadvertently gave that number as the number of the car he had used. "And what happened, I just made a mistake, and since I had this number on my mind, I ran NZK 002 instead of the number that I had out." On cross-examination defendant was asked when it was he first recalled that he had mistakenly associated the number NZK 002 with the loss of his own notebook. He testified that it was after he had testified before the grand jury. He was then asked whether at the grand jury hearing he was questioned about the number. Defendant indicated that he had been asked about it; that at the time he testified before the grand jury he did not recall his mistake.

Stafford testified on cross-examination that he knew his codefendant Canard to be a part-time bartender and gambler. The prosecutor, attempting to establish that Stafford knew Canard to be a bookmaker, referred to the fact phone numbers of bookmaking establishments appeared next to Canard's name in Stafford's notebook. Stafford testified that he placed them there because he "had to associate them with somebody" and he knew Canard hung around those locations. Stafford was then asked to read certain testimony he gave before the grand jury. He was then asked whether he believed these were Canard's places. The grand jury testimony referred to was never read into the record. Stafford testified that he had stated before the grand jury that the places may have belonged to Canard. He then indicated that it was rumored that Canard was engaged in bookmaking at those spots.

The prosecutor asked Stafford about his relationship with Cyril Myers. Stafford testified he knew Myers as a gambler and heard he had loaned a bookmaker money for a bookmaking operation. It was then brought out that before the grand jury Stafford had testified that Myers "was the money behind" some bookmaking. The defense objected that the grand jury testimony was not impeaching evidence; that there was nothing inconsistent about the former testimony.

Finally, Stafford was questioned about the entry in his notebook "make meet with Cy, Maury, Hank." Defendant testified it referred to Gordon Jones, Hank Weldon and Maury Rissman. He stated that there was no arrangement to meet Myers and Adler at the Westward Ho Restaurant. He was then referred to his grand jury testimony. His former testimony was that he did not recall what the notation meant or to whom it referred; he could not remember whether the "Maury" referred to Maury Adler; there had been no prior arrangement to meet Myers, Adler or De Maddalena at the Westward Ho. At this point the defense again objected this was not impeachment; that it was Stafford's testimony almost word for word.

The jury was admonished that this line of questioning was admissible solely on the issue of Stafford's credibility as a witness.

Manifestly, the use of the grand jury testimony had little, if any, impeaching effect (as the defense was quick to point out at the time the prosecution sought to employ it). If *Garrity, supra,* applies, retroactively, to this case, the trial court

was in error in permitting the prosecution to use Stafford's grand jury testimony in impeaching him. Whether or not that decision will be so applied has not yet been decided by the Supreme Court of this state. We need not decide it here, since, assuming that error was committed, it was not prejudicial. Beyond a reasonable doubt, the error in permitting the use of the grand jury testimony could not have prejudiced Stafford. (*Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710, 87 S.Ct. 824].)

The judgments are affirmed.

Files, P. J., and Kingsley, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied February 21, 1968.